UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
DAVID WILLIAMS, ADRIAN BROWN and
HILBURN WALKER, on behalf of          Case No.  15-cv-5610 (SDA)
themselves and all others similarly situated,

                 Plaintiffs,

        -against-

EPIC SECURITY CORP. and SELWYN
FALK,

                Defendants.
---------------------------------------------------------X

## DEFENDANTS' POST-TRIAL MEMORANDUM

CONDON CATINA & MARA, PLLC
55 Old Turnpike Road, Suite 502
Nanuet, New York 10954
(845) 627-8500

*Attorneys for Defendants*

On the Brief:

Laura M.  Catina (LC2998)
Brian K.  Condon (BC4683)

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

PRELIMINARY STATEMENT ........................................................................1

PROPOSED FINDINGS OF FACT ...............................................................3

PROPOSED CONCLUSIONS OF LAW ......................................................27

    I.      Plaintiffs are not Entitled to Compensation Pursuant to
          the FLSA and the Portal-to-Portal Act or under New York Labor Law .........27

    II.     Defendant Selwyn Falk is not an Employer  ...................................34

    III.   The New York Labor Law does not Permit an Employee to
          Recover Damages at a Rate Higher than the Minimum Wage .......................35

CONCLUSION ...........................................................................................38

## **TABLE OF AUTHORITIES**

### **CASES**

**Page(s)**

*Adams v. United States,*
    U.S. Court of Federal Claims, No. 90-162C (Fed. Cl. Dec. 9, 2009) ......................30

*Bethune v. TW Telecom Holdings, Inc.,*
    2011 WL 856173, *1 (S.D.N.Y. March 9, 2011) ....................................................27, 28

*Brantley v. Ferrell, Inc.,* 112 F. Supp. 3d 1348, 1375 (S.D. Ga. 2015) ...........................33

*Contrera v. Langer*, 314 F. Supp. 3d 562, 568 (S.D.N.Y. 2018) ......................................35

*Fallman v. Hotel Insider Ltd.,* 2016 WL 316378 at *8 .....................................................36

*Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 496 (S.D.N.Y. 2017),
    aff'd, No. 17-3356-CV, 2018 WL 5098817 (2d Cir. Oct. 18, 2018) .........................27

*Gortat v. Capala Bros., Inc.,* 257 F.R.D. 353 (EDNY 2009) ...........................................31

*Gottlieb v. Kenneth D. Laub & Co.,* 82 N.Y.2d 457, 605 N.Y.S.2d 213 (1993) ..............36

*Hajny v. Best Roofing of New Jersey,* 2011 WL 2493737 (SDNY 2011) .........................33

*Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999) .................................34

*Hernandez v. NJK Contractors, Inc.,* 2015 WL 1966355 (EDNY 2015) .........................32

*Mongale v. Scholastic, Inc.,* 2007 WL 766282 at *2 (S.D.N.Y. Mar. 9, 2007) ...............36

*Sandoval-Zelaya v. A+ Tires, Brakes, Lubes & Mufflers, Inc.,*
    2017 WL 4322404 (EDNC Sept. 28, 2017) .............................................................33

*Singh v. City of New York,* 524 F.3d 361 (2d Cir. 2008) ..................................................28

*Villar v. Prana Hosp., Inc.,* 2017 WL 1333582 at *4 (S.D.N.Y. 2017) ...........................37

## STATUTES

**Page(s)**

### FEDERAL

29 U.S.C. §254(a) ..............................................................................................27, 28

29 C.F.R. §790.8(a) .................................................................................................28

### STATE

N.Y. Lab. L. § 198(3) ............................................................................................35

## PRELIMINARY STATEMENT

Defendants, EPIC Security Corp. (hereinafter "EPIC") and Selwyn Falk (hereinafter "Falk"), respectfully submit this Post-Trial Brief per the Court's order dated December 14, 2018. For the reasons set forth herein, based upon the evidence presented at trial, Plaintiffs' claims should be dismissed in their entirety.

The Plaintiffs in this case allege that the Defendants "intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA and the NYLL." *See* First Amended Complaint, ¶52.  No such pattern, practice or policy was established by the evidence presented at trial, nor was there any evidence that EPIC acted with anything other than good faith.  Plaintiffs allege that they were hired by EPIC as "drivers" and that they were each required to drive an EPIC vehicle to their work sites from EPIC's headquarters.  There were thousands of pages marked as exhibits during the trial in this case – not one document states that any of the Plaintiffs in this case were required to drive an EPIC vehicle to their work site.  In fact, EPIC's general policy, which is set forth in the Job Regulations signed by each security guard that is hired by EPIC, is that EPIC does not provide transportation for the security guards to their respective work sites.   In some circumstances, which are at issue in this case, EPIC will deviate from that policy and provide a vehicle for certain guards to commute to their work site.   Time spent commuting is not compensable.

There was no evidence presented at trial to corroborate the testimony of some of the Plaintiffs that they were required to drive an EPIC vehicle to their work sites or that it was in any way part of their responsibilities as a security guard.  In fact, some of the Plaintiffs testified that, contrary to what was sworn to in their Affidavits, they were *not* required to drive to their work sites in an EPIC vehicle – it was for convenience.  Many testified that had EPIC not provided them with a vehicle, they would not have taken the assignment.  If Plaintiffs allege that it was EPIC's

policy to require them to drive an EPIC vehicle to their work sites, yet some Plaintiffs testified that it was not a requirement, then it could not possibly be EPIC's policy to require these guards to drive a vehicle.   At any given time, EPIC employs between three hundred (300) and four hundred (400) security guards, which includes armed couriers.   To find that EPIC "required" the twenty (20) Plaintiffs that are left in this case, as a general policy, to drive an EPIC vehicle to their work sites and not pay them for the time that they spent driving would be contrary to the evidence presented at trial.

The evidence presented at trial did not establish that the Plaintiffs were required as part of their responsibilities as a security guard to drive an EPIC vehicle to their work sites, nor did it establish that the time spent traveling to and from the work sites was compensable.   The evidence did not establish a policy created by EPIC to force its security guards to drive EPIC vehicles to their worksites and not compensate them for that time.   EPIC's general policy was *not* to provide a method of transportation to its security guards and the circumstances presented in this case were clearly the exception to the general rule.   Towards this end, much of the Plaintiffs' testimony was clearly a recitation of what was prepared by their attorneys' in their Declarations and Affidavits. For the Plaintiffs to each testify that the Affidavits contained their own words, when each Affidavit contained virtually identical statements, is completely incredible.

*Even if* the Court determines that the Plaintiffs were required to drive an EPIC vehicle to their work sites and that EPIC received a benefit from having the Plaintiffs drive an EPIC vehicle to their work sites, such a finding would not support the conclusion that the time that the Plaintiffs spent driving a vehicle was compensable.

It is inconceivable that EPIC could be held liable based upon the evidence that was presented at trial.  Plaintiffs have not established any violation of the FLSA or NYLL and therefore, are not entitled to judgment against EPIC in this case.

## PROPOSED FINDINGS OF FACT

Defendants' propose the following findings of fact:

**Jose Vicent**

- During the time that Mr. Vicent worked for EPIC, he lived eight blocks from EPIC's headquarters.  749:4-8.[1]

- Mr. Vicent was assigned to the Jewish Child care Association site in Pleasantville.  750:8-11.

- He did not use an EPIC vehicle to patrol the site.  He was stationed in a guard booth. 750:13-21.

- When he arrived at the Jewish Childcare Association site, he would park the vehicle on the side of the guard booth.  750:17-21.

- No one at EPIC told Mr. Vicent that he had to take the vehicle to this site.  753:2-3.

- If he had his own vehicle he would have taken his own vehicle to the Jewish Childcare Association site.  753:4-6.

- Mr. Vicent was not required to drive an EPIC vehicle to the Jewish Childcare Association site.

- Mr. Vicent worked at a site by the name of Avalon Bay in Watchung, New Jersey.  753:7-10.

- He did not patrol the Avalon Bay site in an EPIC vehicle.  753:11-14.

---

[1] The page references herein refer to the Trial Transcripts dated December 10, 2018 through December 14, 2018, which page numbers are consecutive, and the Trial Transcript dated January 7, 2019.

- At the Avalon Bay site, Mr. Vicent drove there, parked the vehicle and sat in a guard booth. 753:7-14.

- Mr. Vicent drove the EPIC vehicle to the Avalon Bay site because it was far away, not because it was a requirement.  754:11-15.

- If Mr. Vicent had his own vehicle, he could have driven there himself.  754:16-18.

- Mr. Vicent worked at a site by the name of Red, White & Blue.  It was the same thrift shop that Mr. Hurst worked at in Paterson, New Jersey.

- Mr. Vicent drove an EPIC vehicle to the thrift shop, parked it in the employee garage, and patrolled inside the store.  755:1-5.

- He did not need an EPIC vehicle to patrol at the thrift shop.  755:6-9.

- Mr. Vicent did not think about taking public transportation because an EPIC vehicle was available.  755:12-14.

- It was convenient for him to walk to EPIC's office and take an EPIC vehicle.  Even if he had his own vehicle he might still have used an EPIC vehicle because it was so close to his house.  755:17-24.

- Using EPIC's vehicle was convenient for Mr. Vicent – he did not have to pay for gas or tolls.  756:8-11.

- Mr. Vicent also worked at 99 Evergreen.  756:24-757:1.

- At the 99 Evergreen site, Mr. Vicent would drive in, park the vehicle, stay in the booth, and do a patrol inside the building every hour.  757:16-20.

- If Mr. Vicent had his own vehicle, he could have driven the vehicle to the site – an EPIC vehicle was not needed at this site.  758:4-10.

- The EPIC vehicle was given to him as a courtesy.  758:11-12.

4

- Mr. Vicent also worked at a site called the Red Oak Power Plant.  He was stationed in a guard booth.  758:13-19.

- Mr. Vicent drove the EPIC vehicle to the Red Oak site because it was convenient.  759:25-760:1.

- When asked whether he could have taken his own vehicle to the Red Oak Power Plant, Mr. Vicent testified, "of course."  760:7-9.

- Mr. Vicent also worked at the Daytop site in Far Rockaway.  760:12-14.

- If he had his own vehicle, Mr. Vicent could have driven it to the Daytop site.  761:11-15.

- By using EPIC's vehicle, he did not have to pay anything out of pocket.  761:16-25.

- Mr. Vicent also worked as a supervisor for a period of time for EPIC. As a supervisor, he drove guards to sites, and dropped vehicles off at sites.  763:1-8.

- Mr. Vicent was not required to drive an EPIC vehicle to any of his work sites.

- There are no documents that state Mr. Vicent was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Saul Veliz**

- During the time that Mr. Veliz worked for EPIC he lived in Union City, NJ. 684:2-6.

- Mr. Veliz owned a SUV at the time and drove that vehicle to some sites.  684:10-19.

- Mr. Veliz worked at a site called 99 Evergreen to which he drove his own vehicle.  686:6-8.

- 99 Evergreen was not a site that required a Radio Motor Patrol Vehicle ("RMP").  Def. Ex. U.

- When Mr. Veliz patrolled the perimeter, he walked – he did not patrol in a vehicle.  687:9-13.

- Mr. Veliz was not required to patrol 99 Evergreen in a vehicle.  688:13-15; *see also* Def. Ex. U.

- Mr. Veliz also worked at a site by the name of Crystal Point Condominium in Jersey City, New Jersey.  689:9-12.

- At Crystal Point he sat in the patrol car – the car was stationary and used for shelter.  He did not have to drive the car around the site.  690:10-19.

- Mr. Veliz testified that when he spoke with his attorney on the phone, the words in his Affidavit are what he told his attorney word for word.  700:2-9.

- Mr. Veliz also worked at a site by the name of Deepdale Gardens in Queens.  He told EPIC that he could not use his car because he lived in Union City and to get there it would cost him $40-$50 every day.  He would have to put gas in his car and with two tolls it was too much.  He asked if he could use an EPIC vehicle and they said yes.  701:22-702:2.

- There was already an EPIC vehicle at Deepdale.  He would drive one vehicle to Deepdale and use the vehicle that was already parked there to patrol the site.  703:18 – 704:3.  The supervisors would come and fill the gas tank.  705:19-22.

- Mr. Veliz's recollection about a site at the Port of Newark was poor, at best.  He remembered that the name "sons" was in it, but nothing else.  On its face, his Affidavit is not accurate and he was having trouble recalling details.  707:14-25.

- Mr. Veliz was not required to drive an EPIC vehicle to any site to which he was assigned.

- There are no documents that state Mr. Veliz was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Hilburn Walker**

- At the time that Mr. Walker worked for EPIC he resided at 151st Street on the Upper West Side.  73:23-25.

- EPIC's office is on 72nd Street and Broadway.  He worked for EPIC from June through August 2015.

- Mr. Walker testified that he worked at a site in Westchester where they were holding a bicycle competition for cancer research.  The guards had EPIC vehicles to get to and from that location.  65:17-24.

- When Mr. Walker was at this site, the EPIC vehicle could be in one part of the park, and he was in another part of the park.  78:6-9.

- There were four vehicles at the site – they were not all used at once.  79:14-22.

- Mr. Walker testified that he worked at a site in New Jersey called Avalon.  He further testified that had he not driven an EPIC vehicle to the site, he would not have gone.  82:3-5.

- Mr. Walker also worked at a site in New Jersey called Greystone.  When he arrived at that site, he would "cut the engine off and listen."  69:1-5. Although this was supposed to be a stationary post, Mr. Walker used the EPIC vehicle to patrol the site.  When supervisors came to the site they told him he was supposed to be stationary at the gate.  69:7-10.

- If Mr. Walker was unable to take an EPIC vehicle he wouldn't have gone.  82:3-5.

- Mr. Walker did have a vehicle, but it was for his wife.  88:6-15.  The only way he would have gotten there is if EPIC let him use their vehicle – he would not have taken the assignment if there was no transportation there.  88:6-15.

- Not every guard came to the site in an EPIC vehicle. The guards that lived in New Jersey used their own vehicles.  88:22-25. There was another EPIC vehicle stationed at this site for the other guards to use.  92:19-93:2.

- Mr. Walker's employment with EPIC was terminated because he was traveling in an EPIC vehicle with his wife in the car.

- There are no documents that state Mr. Walker was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Michael Mitchell**

- Mr. Mitchell worked at sites in Manhattan that he did not drive to.  The last site he worked at was Forest Hills Gardens in Queens.  308:16-18.

- Mr. Mitchell testified that there was an "extra" "emergency" vehicle kept at the Forest Hills site.  309:1-5; 312:15-17.

- Apparently Mr. Mitchell believed that the "extra" vehicle stored at the Forest Hills site was "geared to really monitor, monitor a person's activity."  309:16-25.

- In contradiction to his Affidavit, Mr. Mitchell first testified that he drove an EPIC vehicle to the Forest Hills site every day.  314:12 – 317:6.  When he was shown his Affidavit, he changed his testimony and stated that "[s]ome days I would go straight to the Epic site and then some days I would go straight to the Epic Security site."  316:18-317:4.

- Further, at trial, Mr. Mitchell testified that he could not give a percentage as to the amount of times he drove an EPIC vehicle to Forest Hills, as opposed to commuting straight from his home to the site.  317:19-24.  Yet, in his Affidavit, which was drafted by his counsel, he was able to recall that it was sixty-five percent (65%) of the time. 319:3-12.

- A review of the call-in sheets maintained by EPIC indicates that at the Forest Hills Gardens there is an "EPIC RMP at site." *See* Def. Ex. JJJ, e.g., bate stamped pages EPIC0000005830, 6181.

- Mr. Mitchell's testimony, as a whole, is not credible.

- Mr. Mitchell testified that he was written up for not filling up the gas tank and that he was given a copy of the write-up but he "threw it in the garbage." 321:22-322:2.

- There are no documents that state Mr. Mitchell was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Warren Richardson**

- Mr. Richardson lived in Harlem during the time that he worked for EPIC. 612: 20-24.

- Similar to Mr. Veliz, Mr. Richardson worked at Deepdale Gardens in Queens. He testified that, although there was an EPIC vehicle already at the site, it was there "for show." 614:22-23.

- Mr. Richardson's testimony contradicts the testimony of Mr. Veliz.

- In between headquarters and Deepdale he did nothing other than just drive there. 625:1-3.

- Mr. Richardson testified that Paragraph 11 of his Affidavit was his words "verbatim," even though it was virtually identical to every other Affidavit signed in this case. 623:10-23.

- Whenever he picked up an EPIC vehicle he had to fill up the tank – the cars would have various levels of gas in them. 624:9-11.

- There are no documents that state Mr. Richardson was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Michael Hurst**

- Mr. Hurst worked for EPIC from October 2014 – December 2016.  460:21-23.

- He was living in Mount Vernon and would sometimes use his mother's vehicle.  460:24-461:4.

- When he drove his mother's car to the site in Westchester he expected EPIC to pay his gas and tolls.  501:11-20.

- He worked at Northstar Contracting in New Jersey.  470:16-23.

- More often than not when he picked up a vehicle it was low on gas.  471:21-24.

- When he worked at Northstar, he would drive an EPIC vehicle to the site and the guards who lived in NJ would use their own personal vehicles to get to the site.

- In addition to the vehicle that he drove to the site, there was an EPIC vehicle left at the site for the other guards to use.   488:11 – 489:16.

- Mr. Hurst was not required to drive an EPIC vehicle to Northstar.

- Mr. Hurst was assigned to a site by the name of Jewish Childcare Association in Pleasantville.  Although he alleges he was required to drive an EPIC vehicle to this site, he rarely did so there because he rode the bus there and back.  475:20-476:4.

- Mr. Hurst also used his mother's car to get to Jewish Childcare Association.  479:18-21.

- Mr. Hurst was not required to drive an EPIC vehicle to Jewish Childcare Association.

- Jewish Childcare Association did not require a RMP.  *See* Def. Ex. A.

- Mr. Hurst was assigned to the Red White & Blue thrift shop in New Jersey.  484:12-18.

- Mr. Hurst did not patrol in an EPIC vehicle at this site.  486:21-24.

- Red White & Blue did not require a RMP.  *See* Def. Ex. E.

- Paragraph 7 of Mr. Hurst's Affidavit is verbatim the language that was contained within every other Declaration and Affidavit filed by the other Plaintiffs.

- There are no documents that state Mr. Hurst was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

## David Williams

- Mr. Williams was assigned to work at a site by the name of Daytop Village ("Daytop") in Far Rockaway, Queens.

- Daytop did not require a RMP.  *See* Def. Ex. III.

- Mr. Williams was given a vehicle by EPIC to travel to Daytop due to the conditions resulting from Hurricane Sandy.

- There were several inconsistencies in the Vehicle Use Reports filled out by Mr. Williams. 46:13-56:5.

- Mr. Williams worked for EPIC for a total of 16 days.  *See* Def. Ex. KKK.

- Out of those sixteen (16) days, he drove an EPIC vehicle to Daytop nine (9) times.  *See* Def. Ex. KKK.

- There are no documents that state Mr. Williams was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

- Mr. Williams was not required to drive an EPIC vehicle as part of his responsibilities as a security guard.

## Jonathan Reece

- Mr. Reece was a supervisor for EPIC.  638:17-22.

- When he was a supervisor he transported guards and vehicles and was paid for all of his time that he spent driving.  640:8-14.

11

- Mr. Reece was assigned to work at the 99 Evergreen site.  He testified that he patrolled inside on foot and outside sometimes in a vehicle.  644:5-13.

- This is contradictory to the testimony of Saul Veliz, who testified that he patrolled the site at 99 Evergreen on foot, inside and outside, and was not required to patrol in an EPIC vehicle.  688:13-15

- There was a guard booth at that location. If he wasn't patrolling he would be in the booth.  644:24-25.

- Mr. Reece was also assigned to work at a site by the name of Jacksonville Chapel located in Lincoln Park, NJ.  He would act as a crossing guard essentially.  647:15-23.

- Jacksonville Chapel did not require a RMP.  *See* Def. Ex. FF.

- Mr. Reece was not required to patrol the site at Jacksonville Chapel in an EPIC vehicle.

- If EPIC told him that he had to get to the site on his own he would not have taken the assignment.  648:16-19.

- Mr. Reece worked at other sites that he did not drive to.  He would take the subway.  649:1-6.

- Mr. Reece was assigned to a site by the name of Castaway Yacht Club.  He would park the vehicle and walk around.  650:2-6.

- Mr. Reese testified that he did not do motor patrol at this site.  651:14-18.

- Castaway Yacht Club did not require a RMP.  *See* Def. Ex. R.

- Mr. Reece would not have accepted this assignment had he not been given a vehicle to get there.  652:3-6.

- Mr. Reece was also assigned to Daytop.  He worked there for 4 months. 652:16-25.

- Daytop did not require a RMP.  653:4-11; *see also* Def. Ex. III.

- There were inconsistencies between Mr. Reece's testimony and his Affidavit. For example, his Affidavit does not say that he picked up guards on his way back to headquarters, although that is what he testified to at trial. 655:6-9.

- Mr. Reece's trial testimony was further inconsistent when he was cross-examined. He testified on cross-examination that he handwrote his Affidavit and Declaration for his attorney to type up. 659:2-11. Then, when he was further examined by his attorney on redirect he changed his answer and testified that he gave his attorney the information verbally and he was taking notes. 663:3-7.

- There are no documents that state Mr. Reece was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

## James Foster

- Mr. Foster was hired by EPIC as a supervisor. 221:15-19.

- When he was a supervisor, he traveled to different sites to check on security guards. 224:5-18.

- Mr. Foster was assigned to a site by the name of Ray Catena in Westchester where he worked two days per week for approximately six to eight months. 232:12-14.

- There were times that Mr. Foster patrolled the Ray Catena site on foot, and other times in the EPIC vehicle. 233:1-3.

- No one at EPIC told Mr. Foster that driving an EPIC vehicle to the Ray Catena site was required. 237:21-238:5.

- Had someone told Mr. Foster that he had to take his own vehicle, or public transportation, to the Ray Catena site, Mr. Foster probably would have refused the assignment. 238:11-14.

13

- Although Mr. Foster initially claimed he was entitled to compensation for time spent driving to Lenox Terrace, he testified at trial that he did not drive an EPIC vehicle to Lenox Terrace.  238:6-10.

- Mr. Foster does not know what he is seeking compensation for.  239:10-18.

- There are no documents that state Mr. Foster was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Shakiema Cadora**

- Ms. Cadora was employed by EPIC from June 2014 through December 2015.  Jan. 7, 2019 Tr. 31:3-4.

- The only site that Ms. Cadora worked at was Floyd Bennett Field, otherwise known as the RAAD Construction site.  Jan. 7, 2019 Tr. 31:5-10.

- The RAAD Construction site did not require a RMP.  *See* Def. Ex. D.

- Notwithstanding the fact that the contract between EPIC and RAAD does not require a RMP, Ms. Cadora testified that her job responsibilities included patrolling the area with the vehicle.  Jan. 7, 2019 Tr. 32:11-12.

- Ms. Cadora could not remember who at EPIC told her that she had to come to headquarters and retrieve a vehicle.  Jan. 7, 2019 Tr. 34:2-11.

- There were instances when she picked up an EPIC vehicle at headquarters and it did not have enough gas.  Jan. 7, 2019 Tr. 35:8-12.

- There were other security guards who traveled to the same site by bus.  Jan. 7, 2019 Tr. 36:6-19.

- The language contained within paragraph 7 of Ms. Cadora's Declaration is identical to the language contained in the other Declarations filed in this case, even though Ms. Cadora testified that they were her words.  Jan. 7, 2019 Tr. 39:6-10.

- On the call-in sheets maintained by EPIC for the time during which Ms. Cadora was employed, Ms. Cadora's name does not have the notation "driver" next to her name on any entry.  *See* Def. Ex. JJJ, e.g., bate stamped pages EPIC0000008496, 8562, 5408, 5472, 5575, 5693, 5810, 6209, 6252, 6367.

- There are no documents that state Ms. Cadora was required to drive an EPIC vehicle to her work site(s) as part of his responsibilities as a security guard.

**Tacquesha Lawyer**

- Ms. Lawyer was employed by EPIC from December 2014 through April 22, 2015.   Jan. 7, 2019 Tr. 6:6-9.

- Ms. Lawyer's employment was terminated by EPIC for stealing.

- Ms. Lawyer lived in Harlem during the time that she was employed by EPIC.  Jan. 7, 2019 Tr. 11:15-22.

- Ms. Lawyer was written up five or six times for arriving late to her work site.  Jan. 7, 2019 Tr. 16:1-12.

- Ms. Lawyer's testimony at trial regarding the reason she was written up was inconsistent with documents that she signed previously stating why she was written up. Jan. 7, 2019 Tr. 16:13-17:4.

- Ms. Lawyer's employment with EPIC was terminated because she was accused of stealing.

- There were instances when Ms. Lawyer retrieved an EPIC vehicle and the gas tank was close to empty.  Jan. 7, 2019 Tr. 18:22-19:1.

15

- Had EPIC not given Ms. Lawyer a vehicle to drive, she would not have accepted the assignment at Ardsley Country Club. Jan. 7, 2019 Tr. 21:6-8.

- There are no documents that state Ms. Lawyer was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

## Junior Etienne

- Mr. Etienne worked for EPIC for three or four weeks in February, 2013.  At the time he lived in Brooklyn. 529:10-16.

- Mr. Etienne worked at a beach in Far Rockaway patrolling the beach.  531:1-9.

- The information that is contained in his Affidavit and Declaration was typed by his attorneys and he gave them the information orally.  536:17-539:1.

- Paragraph 8 of his Affidavit reads exactly like every other Affidavit, yet he testified that what was contained within the Affidavit were all his own words.  539:21-540:3.

- When he answered question 8, which was, "What, if anything, did you do when you returned the vehicle to the office after your shift?" he responded, in part, that "Usually I would have to fill it up with gas before returning it."  He did not respond that it was required.  545:10-25.

- There are no documents that state Mr. Etienne was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

## Michael Howie

- Mr. Howie was employed by EPIC for one month.  450:11-15.

- He worked at a construction site in Queens where they were building three restaurants. 451:1-5.

- When he was not patrolling the site in the vehicle he used it for shelter.  453:11-13.

- On page three of Mr. Howie's Declaration, question eight, he was asked the following: What, if anything, did you do when you returned the vehicle to the office after your shift? Mr. Howie's answer was as follows:  "I returned my vehicle to the garage after my shift.  I do not remember filling the vehicle up with gas.  Then I would have to finish filling out the Vehicle Use Report and return the Vehicle Use Report to EPIC's office."

- Mr. Howie answered a question that he was not asked.  Nowhere in question 8 does it mention anything about filling up the tank with gas.

- When asked whether anyone, other than his attorneys, asked him to answer a question with regards to his having to fill up the vehicle with gas, he answered that he "just went with what he remembered." 456:4 – 459:2.

- There are no documents that state Mr. Howie was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Michael Moulton**

- Mr. Moulton worked at EPIC for almost one year, from April 7, 2015 through March 7, 2016.  549:15-17.

- Mr. Moulton worked at two sites to which he drove an EPIC vehicle.  Those sites were Impact Real Estate and Ray Catena.  550:10-12.

- There were between six and eight other sites that he did not drive to.  550:13-15.

- When asked if paragraph 8 of his Affidavit, which is verbatim the same language contained in the other Affidavits, was his own words, Mr. Moulton testified that they "are his words verbatim because that's what I had to do when I got the car."  557:1-22.

- Paragraph 8 is verbatim to the words of every other Plaintiff.

- Contrary to some other Plaintiffs, Mr. Moulton testified that EPIC's policy was that if the gas tank was less than half full, it had to be filled up.   558:8-22.

- There are no documents that state Mr. Moulton was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Princess Logan Williams**

- Ms. Logan Williams worked for EPIC between October 2013 and April 2014.  587:11-13.

- Ms. Logan Williams was assigned to the Garden State Plaza mall in New Jersey.  592:5-13.  She was also assigned to a site by the name of Russo Development in Orange County, New York.  589:5-9.

- There are no documents that state Ms. Logan Williams was required to drive an EPIC vehicle to either of these sites as part of her responsibilities as a security guard.

**Roger David**

- Mr. David worked for EPIC from January 2014 through September 2016.  727:6-8.

- He was assigned to a site in Westchester by the name of Rosenthal Jewish Community Center.  727:23-25.

- Rosenthal Jewish Community Center did not require a RMP.  *See* Def. Ex. YY.

- Mr. David would not have accepted the assignment if he had to take his own vehicle.  732:5-9.

- There were sites Mr. David was assigned to where he did not use an EPIC vehicle to travel to the work site.  732:12-14.

- Mr. David was assigned to a site in Orangeburg, New York.  734:20-735:2.  He drove an EPIC vehicle to this site although he did not patrol the site in the vehicle.  735:19-25.

- If Mr. David wanted to take his own vehicle up to the site in Orangeburg, he would have been able to. 736:1-4.

- Had he driven his own vehicle to the site, he would have had to pay for gas and tolls. 741:3-6.

- It was a benefit for Mr. David to drive EPIC's vehicle to the site as opposed to his own. 741:7-15.

- There are no documents that state Mr. David was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Winston Synaker**

- Mr. Synaker was hired as a supervisor for EPIC. 772:23-25.

- He was fired for coming to work late. 773:1-3.

- There are no documents that state Mr. Synaker was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard at any time that he was not acting as a supervisor.

**Sharon Carr**

- Ms. Carr worked at Garden State Plaza and Sea Girt Beach, otherwise known as Dutra Group. 264:16-265:1.

- Although Ms. Carr's understanding was that if you refused an assignment, it meant you didn't want the position anymore, she could not remember the name of any person that allegedly gave her that information. 282:25-9.

- Ms. Carr testified that it was a requirement to fill up the gas tank; however, not everyone did it. 287:20 – 288:11. When asked whether she knows if anyone else at EPIC was ever written up for not filling up the gas, Ms. Carr testified that she doesn't think they were

19

written up for not filling up the gas.  She testified "I don't really think they cared too much." 288:8-11.

- Paragraph 8 of her Affidavit is the same as every other Plaintiff.

- There are no documents that state Ms. Carr was required to drive an EPIC vehicle to her work site(s) as part of her responsibilities as a security guard.

## Deneice Martin

- Ms. Martin worked at Garden State Plaza and a construction site in Orange County.  435:3-6.

- At Garden State her job was to patrol the construction area – construction of a new parking lot.  436:7-12.

- Although she testified that when she asked if she had to go to this site she was told if she didn't go she would be fired, she could not remember the name of the person who told her that.  439:4-5.

- Regarding her Affidavit, she testified that the words set forth in the Affidavit are her own words, although paragraph 10 of her Affidavit is identical to every other Affidavit submitted.  439:25-440:9.

- At the construction site in Orange County, she did not have to patrol in the vehicle.  She was stationary and the vehicle sat in front of the construction site.  442:8-23.

- The requirement that the gas tank be filled was not a written requirement.  The vehicle was never full when she picked it up in the morning before her shift.  444:25-445:3.

- There are no documents that state Ms. Martin was required to drive an EPIC vehicle to her work site(s) as part of her responsibilities as a security guard.

**Israel Rivera**

- Mr. Rivera has worked for EPIC since 2011.  Since that time, his title has changed to "mobile driver" which, Mr. Rivera testified, entails driving a vehicle.  511:2-10.

- There is no such position at EPIC.

- He testified that he has been taken to or transported to a site by an EPIC supervisor, which supports EPIC's argument that if a guard did not have a way to get to a site, a supervisor would take them there.  513:16-21.

- Mr. Rivera has also worked at sites where a supervisor delivered the vehicle to the site. 514:1-4. He has worked at sites where when he got to the site the vehicle was already there. 514:5-8.

- When he worked at Floyd Bennett Field (RAAD Construction) he did not have to patrol the area in the EPIC vehicle.  517:7-9.

- RAAD Construction does not require a RMP.  *See* Def. Ex. D.

- Mr. Rivera also worked at the water tower located at 400 Grumman on Long Island. 518:18-23.  It was a fenced in water tower that did not require patrol in the EPIC vehicle. 518:25-519:3.

- Mr. Rivera testified that he would usually have to stop and fill the vehicle with gas because it was low on gas.  521:3-6. He could not remember the verbal exchanges he says he had regarding filling the gas tank.  521:23-522:1.

- Paragraph 7 of his Declaration is verbatim to the Declarations filed by all of the Plaintiffs. 525:21-526:2.

- There are no documents that state Mr. Rivera was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

21

**<u>Samuel Wright</u>**

- There are no documents that state Mr. Wright was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

- Mr. Wright worked at the Daytop Village site in Far Rockaway.  *See* Offer of Proof, Dock. No. 154, ¶12.

- Daytop Village did not require a RMP.  *See* Def. Ex. III.

- Mr. Wright was assigned to a site by the name of Jacksonville Chapel.  *See* Offer of Proof, Dock. No. 154, ¶14.

- Jacksonville Chapel did not require a RMP.  *See* Def. Ex. FF.

**<u>Jimmy Butler</u>**

- Mr. Butler was assigned to work at a site by the name of Restaurant Depot in Queens.

- He was also assigned to work at a site by the name of Livingston Builder on the East Side of Manhattan. He testified that he sat in the vehicle during his shifts. 670:10-17.

- For his Affidavit and Declaration, he gave his attorney the information verbally and they typed it up.  674:9-23.

- Mr. Butler worked at a site in Princeton, New Jersey where he patrolled on foot.  676:20-22.  Mr. Butler traveled to the work site in an EPIC vehicle, but once he got there he parked the car and walked around the perimeter. 676:25-677:6.

- He thinks he is suing for time he worked as a supervisor.  680:17-19.

- When he picked up the vehicle it did not always have a full tank of gas.  680:24-681:3.

- EPIC requested that he fill the gas up if it needed gas but it was not required.  682:17-22.

- There are no documents that state Mr. Butler was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Adrian Brown**

- Mr. Brown was employed by EPIC from February 2015 through December 2016.  94: 2-8.

- Mr. Brown testified that when he retrieved an EPIC vehicle from headquarters, a lot of the time the gas tanks were almost empty.  99:22-25.

- Mr. Brown did not drive an EPIC vehicle to every site to which he was assigned.  113:9-12.

- Mr. Brown did not drive an EPIC vehicle to the Lenox Hill site.  113:9-12.

- Mr. Brown was assigned to a site in Princeton, New Jersey.  Had EPIC not provided him with a vehicle to travel to this work site he would not have taken the assignment.  116:6-12.

- Mr. Brown was assigned to a site located in Smith Point County Park for a client by the name of Dutra Group.  Had EPIC not provided Mr. Brown with a vehicle to travel to the work site he would not have taken the assignment.  126:22-127:1.

- Mr. Brown as assigned to a site by the name of Leesel Transportation, which was located on Webster Avenue in Bronx, New York.  130:7-13.  Had EPIC not provided him with a vehicle to travel to this work site he probably would not have taken the assignment.  130:21-23.

- Mr. Brown was assigned to a site in Fort Lee, New Jersey where he was responsible for sitting in a guard booth and checking identifications.  Although he drove an EPIC vehicle to the site, he did not use the vehicle to patrol the site.  136:21-137:20.

- Mr. Brown testified that had EPIC not provided him with a vehicle to travel to this work site, he would not have taken the assignment.  137:24-138:1.

- There are no documents that state Mr. Brown was required to drive an EPIC vehicle to his work site(s) as part of his responsibilities as a security guard.

**Henry Cullen**

- EPIC strictly enforces its rules. 144:10-11.

- EPIC has a written policy that states as follows, "EPIC Security Corporation does not provide transportation for the employees to the work site." 148:13-19; PT3147-3149.

- EPIC's policy to deviate from that rule on occasion and permit certain guards to utilize an EPIC vehicle to travel to and from their work site(s) is an unwritten policy. 148:9-13.

- EPIC does not hire security guards as "drivers." 181:8-9.

- When EPIC hires security guards, they check to see if a person has a valid driver license and whether they have points on their license. EPIC considers them "authorized drivers" which means that they will be authorized to use an EPIC vehicle if necessary. It assists EPIC in knowing which jobs they can assign guards to. 181:10-19; 184:10-12.

- There are security guards that have driver licenses but do not wish to drive and are not given an assignment at a site that has a RMP. 184:5-9.

- There are sites that require a RMP where the guards utilize their own vehicle to get to the worksite, such as Northstar Contracting. 183:1-25. In those circumstances, when the vehicle has to get to the site in some other manner, a supervisor will drop off the vehicle. 184:1-2; 185:1-3.

- There are sites where an EPIC vehicle is left at the site. Currently, one site where an EPIC vehicle is left at the site 24/7 is Forest Hills Gardens. 185:4-13.

- Security guards do not have to travel to EPIC's office to retrieve any tools to take to their work sites.  They are already there and would be brought there by a supervisor.  187:13-22.

- When a guard is assigned to a particular worksite, they have the right to decline the request within reason.  There have been instances when a guard has declined a job assignment. 187:23-188:5.

- Even if a site does not require a RMP, EPIC will provide some guards with the option of utilizing an EPIC vehicle to travel to and from their work site.  188:9-14.

- None of the Plaintiffs that testified prior to Mr. Cullen's testimony ever indicated to him that they did not want to accept a particular assignment.  195:17-19.

- EPIC does not require the security guards who utilize an EPIC vehicle to travel to and from their work site(s) to fill up the gas tank when they return from a shift.  197:20-198:2.

- EPIC has never disciplined any EPIC employee for not filling up a vehicle with gas. 198:10-12.

- It is very rarely Selwyn Falk's decision whether to lend an EPIC vehicle to a security guard to drive to a work site.  208:23-209:3.

## Selwyn Falk

- Mr. Falk is the Vice President of EPIC.  93:9-12.

- Mr. Falk does not hire security guards.  He does hire administrative staff.  93:15-18.

- Mr. Falk is not involved in the decision to allow security guards to drive an EPIC vehicle on a daily basis.  350:25-351:2.

- The reason he was involved in the decision to permit David Williams to drive a vehicle to Daytop Village in Far Rockaway was because based upon the condition of the area after

Hurricane Sandy, Mr. Falk was asked if David Williams was permitted to drive a vehicle into that area.  96:11-17.

- Mr. Falk was not involved in setting or monitoring Mr. Williams's hours or job responsibilities.  351:21-23.

- Mr. Falk does not create the company's policies.   If a policy is created, he makes suggestions to Dr. Mark Lerner and Dr. Lerner either approves them or not.  354:1-3.

- Mr. Falk did not create EPIC's overtime policy.  354:8-9.

- Mr. Falk was not involved in creating the policy involving whether security guards would be paid for time spent traveling in an EPIC vehicle to and from their work sites.  100:6-12.

- It is not Mr. Falk's responsibility to advise the operations manager as to compliance with federal and state wage-and-hour laws.  356:1-4.

- One of the responsibilities of a supervisor is to transport EPIC vehicles, as well as guards, to work sites.  394:23-394:10.

- If EPIC has a site that it is not able to cover with a security guard, they send a supervisor to cover the shift.   Each supervisor is trained on each shift for the sites that they usually cover on their tour.  397:11-19.

- Out of between three and four hundred security guards, the majority get to their respective work sites on their own.  401:7-17.

- EPIC has never fired a security guard for not filling an EPIC vehicle up with gas at the end of a tour.  414:2-5.

## PROPOSED CONCLUSIONS OF LAW

Plaintiffs in this case allege that they were "security officers who were required by Defendants to drive EPIC security vehicles to their assigned worksites and were not compensated for the time they spent driving to and from their worksites, in addition to other driving-related activities." First Amended Complaint, ¶1. At trial, the only claim that Plaintiffs sought to establish was their claim for failure to pay minimum wage and overtime wages pursuant to the FLSA and NYLL. Although there were thirty-six plaintiffs/opt-in plaintiffs in this collective action prior to trial, several claims were dropped and/or dismissed and there are now twenty (20) remaining.

**I.** **Plaintiffs are not Entitled to Compensation Pursuant to the FLSA and the Portal-to-Portal Act or under New York Labor Law**

"The FLSA and the NYLL both 'guarantee[ ] compensation for all work ... engaged in by [covered] employees." *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 496 (S.D.N.Y. 2017), aff'd, No. 17-3356-CV, 2018 WL 5098817 (2d Cir. Oct. 18, 2018). "The Act requires employers to pay overtime for 'employment in excess of [forty hours] at a rate not less than one and one-half times the regular rate at which [the employee] is employed.'" *Bethune v. TW Telecom Holdings, Inc.,* 2011 WL 856173, *1 (S.D.N.Y. March 9, 2011). "While Congress made clear that employers are required to compensate employees for 'work' or 'employment,' it did not define the contours of the type of 'work' or 'employment' that merited such compensation." *Id.*

Under the FLSA and the NYLL, "[p]laintiffs bear the burden of proof to establish all claims and damages by a preponderance of the evidence". *Gamero,* 272 F. Supp. 3d 481, 497 (S.D.N.Y. 2017), aff'd, No. 17-3356-CV, 2018 WL 5098817 (2d Cir. Oct. 18, 2018).

In 1947, Congress passed the Portal-to-Portal Act, 29 U.S.C. §251, et. seq., creating two exceptions to the FLSA-mandated compensation:

(1) Walking, riding, or traveling to and from the actual place of performance of the principal activities which such employee is employed to perform; and

(2) Activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. §254(a).

Under subsection (1), no pay is required for travel to and from the place where the employee performs his "principal activities"; the FLSA regulations define "principal activities" as those "which the employee is employed to perform." *See* 29 C.F.R. §790.8(a); *See also Bethune,* 2011 WL 856173, *2.  Subsection (2) "was intended to relieve employers from liability for preliminaries, most of them relatively effortless, that were thought to fall outside the conventional expectations and customs of compensation." *Bethune,* 2011 WL 856173, *2.  Specifically, subsection (2) states as follows:

[T]he use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

29 U.S.C. §254(a)(2).

"The Portal-to-Portal Act exempts employers from compensating employees under the FLSA 'for or on account of time spent traveling to and from the actual place of performance of the principal activity or activities of employment and any activities which are preliminary to or postliminary to said principal activity or activities." *Singh v. City of New York,* 524 F.3d 361 (2d

Cir. 2008).  Here, it is clear that the actual place of performance of the security guard services that the Plaintiffs were employed to provide was at each of their respective worksites.

Plaintiffs allege that they were "required" to drive an EPIC vehicle to their worksites.  As set forth herein, EPIC has between three hundred (300) and four hundred (400) employees at any given time.  Its general policy, as set forth in its Job Regulations, is that it does not provide transportation for the security guards to their work sites.  Providing a vehicle for a security guard to commute to their work site is the exception, not the general policy, which was supported by the evidence (or lack thereof) presented during the trial in this case.  Some Plaintiffs, such as Jose Vicent and Saul Veliz, admitted in no uncertain terms that driving an EPIC vehicle to and from their work sites was a convenience for them and NOT a requirement of their duties as a security guard.  Mr. Vicent, who lived eight blocks from EPIC's office, clearly stated he could have gotten to his work sites by other means.

Towards this end, there were certain sites where there was already an EPIC vehicle at the site, including Deepdale Gardens and Forest Hills Gardens.  Mr. Mitchell's testimony that there was an "extra" "emergency" vehicle kept at the Forest Hills site (309:1-5; 312:15-17) is simply not credible.  His clear anger towards EPIC further taints the credibility of his claims against EPIC.  It is contrary to logic that he would be required to drive one EPIC vehicle to the site, when there was already another vehicle there.  Similarly, the guards who worked at Deepdale Gardens were not required to drive an EPIC vehicle to the site as part of their principle activity as a security guard.  There was an EPIC vehicle stored at the site for use by the guards to patrol the site.  As Mr. Veliz testified, he would drive one vehicle to Deepdale, and use the other vehicle that was already stored there to patrol the site.  Thus, the time Mr. Veliz, and every other guard that worked at Deepdale, spent commuting to that site is not compensable.

In *Adams v. United States,* U.S. Court of Federal Claims, No. 90-162C (Fed. Cl. Dec. 9, 2009), 6,400 federal law enforcement officers filed claims for overtime pay under the Fair Labor Standards Act for time that they spent driving to and from their worksites with a government vehicle.  The plaintiffs were required to commute to and from work in a government vehicle.  For some plaintiffs, driving a government-issued vehicle during their commutes permitted a quicker response to emergent situations.  In some cases, it was simply more efficient for the officer to commute in the government vehicle and to have the vehicle readily available for work purposes.  In addition, the officers were required to have their weapons and other law enforcement related equipment, and to have on and monitor their vehicles' communication equipment.  *Adams v. United States,* No. 90-162C (Fed. Cl. Dec. 9, 2009).  They were not allowed to run any personal errands in the government-issued vehicles.  *Id.*

Merely commuting in a company (or government, in the case of *Adams)* vehicle is insufficient.  *Id.*  Plaintiffs must perform additional legally cognizable work while driving to the workplace.  *Id.*  Simply driving is not enough.  In *Adams,* the Court determined that commuting, even if done for the employer's benefit, with the employer's rules, is non-compensable if the labor beyond the mere act of driving the vehicle is de minimis.  *Id.*  Thus, the fact that the officers were commuting to their workplace with a government-issued vehicle, carrying their weapons and other equipment, and monitoring their vehicles' communication equipment, they were not performing any additional legally cognizable work – they were driving to their workplace.

Not one Plaintiff testified that they were performing any security guard services, or anything related thereto, while they were driving to their worksites.  They were doing even less than the officers in the *Adams* case.  They were not transporting any equipment.  They were not monitoring any communications.  They were not on call to respond to an emergency.  They were

simply driving to their worksites.  Based upon the Affidavits that were filed by each Plaintiff, which contained language that was verbatim, the Plaintiffs conducted the following tasks: they traveled to EPIC's headquarters, picked up a piece of paper, walked to the parking garage and inspected the vehicle for damage.  *See, e.g.,* Declaration of Michael Hurst, ¶7; Declaration of Michael Mitchell, ¶7; Declaration of Sharon Carr, ¶7.  And, *even if* EPIC received a benefit from having some of the Plaintiffs drive an EPIC vehicle to the work sites, this does not convert the time spent commuting to compensable time, per the Court in *Adams.*

The ministerial tasks that the Plaintiffs performed once they arrived at EPIC's office are distinguishable from cases where it was determined that time spent performing tasks prior to the start of a shift was compensable.  For example, in *Gortat v. Capala Bros., Inc.,* 257 F.R.D. 353 (EDNY 2009), former workers brought an action against a construction company and its principals alleging, among other things, violations of the Fair Labor Standards Act and New York Labor Law.  Plaintiffs, construction foremen and laborers, alleged that they were not compensated for the full amount of time that they worked, including time that they spent traveling from their office to their respective job sites.  Specifically, the plaintiffs presented evidence that defendants: (a) required all of their employees to arrive at the defendants' shop in the Greenpoint neighborhood of Brooklyn, New York, at 7:00 a.m., where they would load the defendants' cargo vans with construction materials and tools; (b) after receiving their work assignments, the foremen and laborers would drive from the shop to work sites located in Manhattan; (c) on the way, the vans would often make short stops to purchase construction supplies and to allow the workers to get coffee or breakfast.  After their shifts, the foremen and laborers would drive back to the shop, and meet with the principals to update them on the days' progress.  *Gortat,* 257 F.R.D. 353, 356.

Here, all employees are not required to travel to EPIC's office before going to their respective worksites, which is evidenced by the fact that EPIC has approximately four hundred (400) employees, only thirty-five (35) vehicles, and ultimately twenty (20) people who remain plaintiffs in this collective action.   The Plaintiffs that did come to EPIC's office did not receive work assignments or any instructions, did not load any materials or tools into the vehicles, did not make any stops on the way to their sites to purchase materials, or do anything related to their duties as security guards.

Similarly, in *Hernandez v. NJK Contractors, Inc.,* 2015 WL 1966355 (EDNY 2015), the plaintiffs alleged that they were not compensated for time that they spent traveling from the shop to their respective worksites.  There, the plaintiffs met at the shop at 6:00 a.m.  If a worker arrived at the shop after 6:00 a.m., or ten to fifteen minutes late, they would not be allowed to go to the jobsite. *Hernandez,* 2015 WL 1966355, *4.  One plaintiff testified that it was mandatory that they showed up at the shop in the morning because whoever did not show up, would not work. *Id.* Plaintiffs also testified that they were not allowed to drive themselves directly to the job site. *Id.* Another plaintiff testified that when he overslept one day, he drove himself to the jobsite, and was told that if he showed up directly at the site again he would be sent home. *Id.*

Here, there was no evidence presented at trial that if Plaintiffs did not show up at EPIC's office, they would not work.  Mr. Williams did not drive an EPIC vehicle to his worksite every day.  In fact, he only drove nine (9) out of the sixteen (16) days that he worked for EPIC.  Similarly, there were other Plaintiffs, such as Saul Veliz, who drove their own vehicle.  Plaintiff Michael Hurst drove his mother's car to certain work sites.  Guards who worked at the Greystone site in New Jersey drove their own vehicles there.  Taquesha Lawyer, who was written up several times during her employment with EPIC, was written up for failing to appear at her work site – not

EPIC's headquarters.  Had she been required to travel first to headquarters to retrieve an EPIC vehicle, the write-up would have reflected that she failed to appear at headquarters, not her work site.  There was no evidence of any repercussions to any of the Plaintiffs, or any other security guard for that matter, for not driving an EPIC vehicle.

Not only do the foregoing factors distinguish this case from *Hernandez,* but it makes Plaintiffs argument that they were required to drive an EPIC vehicle to and from their worksites incredible.  *See also Hajny v. Best Roofing of New Jersey,* 2011 WL 2493737 (SDNY 2011)(Plaintiffs were required to report for work each morning at the company's shop. Where they would receive instructions about their day's work, including on which project they were going to work, after which they loaded tools and materials onto the trucks); *Brantley v. Ferrell, Inc.,* 112 F. Supp. 3d 1348, 1375 (S.D. Ga. 2015)(Plaintiffs allegedly arrived at the company's warehouse in the morning to retrieve sockets and wire to load them onto the trucks for delivery to their sites); *Sandoval-Zelaya v. A+ Tires, Brakes, Lubes & Mufflers, Inc.,* 2017 WL 4322404 (EDNC Sept. 28, 2017)(Plaintiffs alleged that they were required to report to the company's shop, load and unload equipment onto trucks, and prepare trucks for out-of-town projects).

The evidence clearly establishes that EPIC did not intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA and the NYLL.  The time that the Plaintiffs spent driving from EPIC's headquarters to their respective work sites was not compensable and, admittedly, not required.  Any other finding is not supported by the inconsistent testimony of the Plaintiffs.  Either they were required to drive an EPIC vehicle to their work sites or they were not.  The evidence supports the conclusion that they were not.  If these Plaintiffs chose to utilize an EPIC vehicle, as was testified to by Saul Veliz and Jose Vicent, because it was a more convenient option for them, EPIC should not be required to pay wages for the time that

they spent commuting to their sites.   Pursuant to the Portal-to-Portal Act, that time is not compensable and the basic tasks that Plaintiffs performed at EPIC's headquarters prior to their shifts were, if anything, preliminary and not part of their principal activities as a security guard. As the Court found in the *Adams* case, such time is not compensable.

## II.        Defendant Selwyn Falk is not an Employer

The evidence presented at trial failed to establish that Falk is an employer under the FLSA and therefore, he cannot be held individually liable in this case.   To be held liable under the FLSA, a person must be an "employer," which § 3(d) of the statute defines broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d) (1994). *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999) *holding modified by Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61 (2d Cir. 2003).   Because the statute defines employer in such broad terms, it offers little guidance on whether a given individual is or is not an employer.   In answering that question, the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the "economic reality" presented by the facts of each case, *Id., citing Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961).

Under the "economic reality" test, the relevant factors include "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.*

None of the foregoing factors are dispositive, and a totality of the circumstances is to be considered in each case.   *See id.*   Here, the totality of the circumstances warrants dismissal of the claims against Falk.   Only one of the factors is present here, which was that he has the power to

34

hire and fire employees.  Falk testified that, even though, hypothetically, he could fire an employee, he has never exercised that power in the thirty-five (35) years he has been employed by EPIC.   In addition, Mr. Falk does not supervise or control employee work schedules, or conditions of their employment.  Mr. Falk does not determine the rate of pay for the security guards, and he does not regularly maintain their employment records.  Mr. Falk does not determine what company policies will be implemented, this is the responsibility of Dr. Lerner.   None of the evidence presented at trial supports the other three factors pursuant to the "economic reality" test and therefore, no liability can be found against Falk.

### III.     The New York Labor Law does not Permit an Employee to Recover Damages at a Rate Higher than the Minimum Wage

In its Order dated December 14, 2018, the Court directed the parties to provide an analysis in our post-trial memoranda as to whether the New York Labor Law permits an employee to recover remedial damages at a rate higher than the minimum wage for an unpaid wage claim.  It does not.  Based upon a review of the relevant case law, it appears that any claim for an agreed upon amount higher than the statutory minimum wage would be a breach of contract claim, not a wage claim pursuant to the New York Labor Law.

"Article 6 of the [New York Labor Law] regulates the payment of wages by employers." *Contrera v. Langer*, 314 F. Supp. 3d 562, 568 (S.D.N.Y. 2018).  "To state a claim under Article 6, [a party] must allege that their wages were withheld in violation of one of the substantive provisions of the Labor Law." *Id*.  "Section 198 of the New York Labor Law, found within Article 6 of the New York Labor Law, is titled 'Costs, remedies.' Subsection (3) of section 198 provides that '[a]ll employees shall have the right to recover full wages, benefits and wage supplements and liquidated damages accrued during the six years previous to the commencing of such action, whether such action is instituted by the employee or by the commissioner.' N.Y. Lab.

L. § 198(3)." *Id.*  In *Contrera,* plaintiffs asserted that section 198(3)'s reference to "full wages" created a cause of action to recover "agreed upon wages." *Id.*  The Court concluded that it did not. *Id.*

Under the NYLL, an employer is required to pay an employee the statutory minimum wage, not a rate higher than that.   Any agreed upon rate higher than the minimum wage would be an agreement between the employer and employee, separate and apart from the statutory requirements of the NYLL.   Thus, any claim for failure to pay the agreed upon rate (which Plaintiffs do not allege in this case, they only allege failure to pay minimum wage), would be considered a breach of contract claim and not recoverable in an unpaid wage claim.

In its analysis, the Court points out that NYLL §198 is not a "substantive provision" but one that addresses procedural matters collateral to liability.  *Id.*  It does not provide a mechanism for a plaintiff to recover a rate higher than the statutory minimum wage.   The reference to "full wages" does not create a "liability imposed by this article" but can only be read as a reference to wages that are otherwise guaranteed by other sections within Article 6.  *Id.*  Wages otherwise guaranteed by Article 6 in this case would be minimum wage.  Plaintiffs here do not allege that they have an agreed upon rate other than minimum wage and do not assert, or seek to assert, a claim for agreed upon wages.  Even if they were to assert such a claim, it would be futile because such damages are not recoverable within a claim for unpaid wages.

The Court in *Contrera* cites to other cases in support of its conclusion that Section 198 does not provide a mechanism to recover "agreed upon wages," including *Gottlieb v. Kenneth D. Laub & Co.,* 82 N.Y.2d 457, 605 N.Y.S.2d 213 (1993)(Section 198 does not stand alone); *Fallman v. Hotel Insider Ltd.,* 2016 WL 316378 at *8 (S.D.N.Y. Jan. 15, 2016)(Section 198 does

not create a cause of action); *Mongale v. Scholastic, Inc.,* 2007 WL 766282 at *2 (S.D.N.Y. Mar. 9, 2007)(Section 198 provides no substantive cause of action at all).

In discussing the cases that found Section 198 allows for an employee to recover damages "for a claim of straight time at a rate higher than the minimum wage if the parties previously agreed to the rate…", such as *Villar v. Prana Hosp., Inc.,* 2017 WL 1333582 at *4 (S.D.N.Y. 2017), the Court noted that none of the cases conducted an analysis of the structure of Article 6 and the statutory language in Section 198. *Contrera,* at 570. In addition, almost all of the cases arose in the context of a default judgment with no adversarial briefing on the issue. *Id.*

Given that the statutory wage required under the New York Labor Law is minimum wage, and any agreement between the Plaintiffs and EPIC in this case would have been separate and apart from the requirements of the NYLL, any claim for agreed upon wages must be asserted as a breach of contract claim and cannot be recovered within the context of this case for unpaid wages. Therefore, even if the Court finds that Plaintiffs are entitled to unpaid wages, the rate should not be higher than the statutory minimum wage.

## **CONCLUSION**

Based upon the foregoing, Plaintiffs have failed to prove that the Defendants violated the Fair Labor Standards Act and/or New York Labor Law.  Plaintiffs have further failed to establish that Defendant Selwyn Falk is an employer under the FLSA or NYLL and therefore, he cannot be found liable for unpaid wages in this case.  Thus, Plaintiffs claims against EPIC Security Corp. and Selwyn Falk must be dismissed in their entirety.

Dated:  January 30, 2019

Respectfully submitted,

CONDON CATINA & MARA, PLLC

By:  s/ Laura M. Catina
       Laura M. Catina
       Brian K. Condon