USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/22/2019

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **Williams, et al.,** | |
| **Plaintiffs,** | |
| **-against-** | |
| **Epic Security Corp. and Selwyn Falk,** | |
| **Defendants.** | |

**1:15-cv-05610 (SDA)**

<u>**OPINION AND ORDER**</u>

**STEWART D. AARON, United States Magistrate Judge:**

Plaintiffs filed this action asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the New York Labor Law ("NYLL"), Article 6, § 190, *et seq*. Plaintiffs allege that their employer, Defendant EPIC Security Corp. ("EPIC") and its Vice President, Defendant Selwyn Falk ("Falk") (collectively, the "Defendants"), failed to pay Plaintiffs for the time they spent driving to and from certain worksites, which time they allege was compensable. Plaintiffs generally allege that they were employed as drivers and required each workday to report to EPIC's headquarters[1] in Manhattan, pick up a company car, and drive from there to worksites where they worked as security guards. Defendants deny Plaintiffs' allegations; they contend that Plaintiffs were employed as security guards and compensated properly and that Plaintiffs were free to report directly to worksites and that use of a company car was for Plaintiffs' convenience.

The parties consented for all purposes (including trial) to be held before me, pursuant to 28 U.S.C. § 636. (Consent, ECF No. 115.) The Court conducted a bench trial from December 10, 2018 through December 14, 2018, and on January 7, 2019. Having considered all the evidence

---

[1] The Court uses "EPIC's headquarters" to refer to the area near or around EPIC's headquarters, since the EPIC cars were kept in a parking garage or on the street near EPIC's headquarters.

and assessed the credibility of the witnesses, the Court makes findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52, as set forth in this Opinion and Order.

## PROCEDURAL HISTORY

Plaintiff David Williams ("Williams") filed this collective action on July 17, 2015. (Compl., ECF No. 1.) Initially, EPIC was the only named defendant. (*See id*.) EPIC filed its Answer on August 12, 2015. (Answer, ECF No. 8.) On November 28, 2016, on consent of the parties, District Judge Hellerstein certified a collective class under the FLSA and approved proposed notices. (Mem. Endorsement, ECF No. 36.)

On August 24, 2017, Plaintiffs filed their First Amended Complaint, which was amended to include Adrian Brown ("Brown") and Hilburn Walker ("Walker") as named Plaintiffs, and Falk as a named Defendant. (*See* First Am. Compl., ECF No. 98.) On September 11, 2017, Defendants filed their Answer to Plaintiffs' First Amended Complaint. (*See* Answer to First Am. Compl., ECF No. 101.)

Over time, thirty-seven plaintiffs consented to join this action, in addition to the three named Plaintiffs. (*See* ECF Nos. 41-50, 52-74, 77-78, 80-82.) After discovery, Defendants moved for summary judgment, arguing that travel time is not compensable and that Plaintiffs' use of a company car was not a requirement of their job. Judge Hellerstein found that there were material issues of fact and denied summary judgment. *Williams v. Epic Sec. Corp.*, No. 15-CV-05610, 2018 WL 2452757 (S.D.N.Y. May 31, 2018). On July 26, 2018, the parties consented to proceedings

before me (Consent, ECF No. 115), and at a conference held on September 7, 2018, a trial was scheduled to commence in December 2018.[2] (9/7/18 Order, ECF No. 120.)

On October 30, 2018, Defendants filed a motion *in limine* seeking permission to call each named and opt-in Plaintiff as a witness at trial. (Not. of Mot., ECF No. 125.) Defendants argued that, "[g]iven the disparity in whether the guards drove to each site, the amount of time they spent driving, and the fact that some guards drove to some sites, and some did not, representative testimony is not appropriate and will not be sufficient in this case." (Defs.' Mem., ECF No. 125-4, at 5.) Plaintiffs opposed the motion, arguing that calling all opt-in Plaintiffs was not necessary and that a representative sample of witnesses' testimony was "more than enough . . . for the court to make a determination in this FLSA collective action." (Pls.' Mem., ECF No. 127, at 4.)

By Order dated November 10, 2018, the Court directed the parties to meet and confer regarding the contents of a short (1-2 page) questionnaire to be completed by each Plaintiff whose deposition had not been taken to elicit sworn responses to the most salient issues in the case (*e.g.*, whether the Plaintiff drove to his or her work site(s) (and how often) and the number of hours traveled). (Text Only Order, ECF No. 129.) Thereafter, each party submitted a proposed questionnaire to the Court. (Letter, ECF No. 130 & accompanying exhibits.)

A pretrial conference was held on November 19, 2018. By Order issued the same day, I granted Defendants' motion *in limine* giving them permission to call each named and opt-in

---

[2] Although Plaintiffs previously had demanded a jury trial, that demand was withdrawn and the parties agreed to a bench trial before me. (*See* 9/7/18 Order ¶ 3.)

Plaintiff as a witness at trial, subject to a 15-hour time limit for each side to put on its case.[3] (*See* Order, ECF No. 131.) Further, after reviewing each side's proposed questionnaire, the Court provided to the parties a revised questionnaire in the form of a sworn Declaration (referred to herein as the "Questionnaire Declaration"), which combined elements from both proposed questionnaires. (*See id.* at 3-5.) The Court ordered that, no later than December 7, 2018, Plaintiffs submit "a sworn questionnaire from each remaining Plaintiff (both named and opt-in), other than those Plaintiffs whose depositions were taken." (*Id*. at 2.) In its November 19, 2018 Order, the Court also permitted the parties (to conserve time against the 15-hour time limit) to submit direct examination by affidavit no later than December 5, 2018. (*Id*. at 1.)

On November 21, 2018, Plaintiffs filed a Letter Motion requesting a pre-motion conference to address their anticipated motion for leave to file a Second Amended Complaint ("SAC") to add claims under the NYLL on behalf of eight opt-in Plaintiffs: Sharon Carr, James Foster, Princess Logan-Williams, Jonathan Reece, Israel Rivera, Saul Veliz, Jose Vicent and Samuel Wright.[4] (Letter, ECF No. 134.) On November 22, 2018, I denied Plaintiffs' Letter Motion for a conference and directed Plaintiffs to file a formal motion to amend. (Mem. Endorsement, ECF No. 135.)

---

[3] Thereafter, 10 of the opt-in Plaintiffs voluntarily dismissed their claims. (Stipulations, ECF Nos. 142, 158 & 161.) In addition, the claims of 5 other opt-in Plaintiffs were dismissed for failure to prosecute. (*See* 12/14/18 Order, ECF No. 162.) Ultimately, a total of 22 Plaintiffs and opt-in Plaintiffs testified at trial and the testimony of one was accepted on consent via Offer of Proof, due to his medical condition. These 23 individuals' claims are decided in this Opinion and Order.

[4] In the First Amended Complaint, the NYLL claims were brought on behalf of the named Plaintiffs and putative "class members." (First Am. Compl. ¶¶ 63-77.) However, Plaintiffs never moved for class certification under Fed. R. Civ. P. 23. Accordingly, the Joint Pretrial Order submitted by the parties on October 19, 2018, and adopted by the Court on October 22, 2018, expressly stated that the NYLL claims were being asserted "on behalf of the named Plaintiffs (Williams, Brown and Walker) only." (Proposed JPTO, ECF No. 123, at 2; JPTO, ECF No. 124, at 2.)

On November 30, 2018, Plaintiffs filed their motion for leave to file a SAC. (Not. of Motion, ECF No. 139.) In their proposed SAC, Plaintiffs sought to add as named Plaintiffs nine opt-in Plaintiffs,[5] the effect of which would be for such Plaintiffs to be permitted to assert claims under the NYLL (which has a longer statute of limitations than the FLSA, as addressed *infra*). (Proposed SAC, ECF No. 140-1, ¶¶ 21-29.) In addition, Plaintiffs withdrew their Third Cause of Action (for Spread of Hours Wages under the NYLL) and Fourth Cause of Action (for Wage Statements under the NYLL). (*See id*. at 17-18.) Otherwise, the allegations of the SAC were identical to the allegations of the First Amended Complaint.

On December 6, 2018, Defendants opposed Plaintiffs' motion to amend. (ECF Nos. 149-50.) Defendants argued that they would be prejudiced by the amendment to add the opt-in Plaintiffs as parties to the NYLL claims since the Defendants did not have an opportunity to take those Plaintiffs' depositions. (Opp. Mem., ECF No. 150, at 2, 5-7.)

On December 7, 2018, the parties appeared for a telephone conference before the Court. (*See* 12/7/2018 Minute Entry.) During the conference, the Court deferred decision on the motion to amend pending trial. The Court reasoned that, since liability under the FLSA and the NYLL is in large part coextensive, the motion to amend implicated only the statute of limitations and the quantum of damages with respect to the opt-in Plaintiffs. The Court directed the parties to submit proof at trial regarding the nine opt-in Plaintiffs both as if the NYLL claims were being asserted by those Plaintiffs, and as if such claims were not being asserted.

---

[5] There is not complete overlap between the eight opt-in Plaintiffs identified in Plaintiffs' Letter Motion (ECF No. 134) and those identified in their motion to amend papers. (ECF Nos. 139-141.) Their proposed SAC adds two new opt-in Plaintiffs (Junior Etienne and Deniece Martin) as named Plaintiffs, but omits Vicent. (ECF No. 140-1.)

Following the bench trial held from December 10, 2018 through December 14, 2018, and on January 7, 2019, Plaintiffs and Defendants each submitted a post-trial memorandum, as well as a response to one another's memorandum. (ECF Nos. 169, 170, 185 & 187.) In addition, Plaintiffs submitted a spreadsheet (and supplemental spreadsheet) of damages calculations (ECF Nos. 170-2 & 186-1), and Defendants submitted objections and corrections to such spreadsheets. (ECF No. 188.)

In this Opinion, I first address Plaintiffs' motion to amend. Next, I address the Court's findings of fact and conclusions of law. Finally, I address the amount of damages, if any, to be awarded to each of the Plaintiffs.

## PLAINTIFFS' MOTION TO AMEND IS GRANTED

Federal Rule of Civil Procedure 15(a) provides that a court should "freely" grant leave to amend "when justice so requires."[6]  Fed. R. Civ. P. 15(a)(2). The decision to grant or deny leave to amend is within the trial court's discretion. *See, e.g.*, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The court may deny leave to amend for "good reason," which involves an analysis of the factors articulated in *Foman*: undue delay, bad faith, futility of amendment, or undue prejudice to the opposing party. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman*, 371 U.S.

---

[6] As the opt-in Plaintiffs are seeking to be added as named Plaintiffs to recover under the NYLL, two other Federal Rules of Civil Procedure are relevant. Federal Rule of Civil Procedure 20 allows persons to join in an action as plaintiffs if: "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a) (1). Federal Rule of Civil Procedure 21 allows the Court at any time to add a party. Fed. R. Civ. P. 21; *see also Hernandez v. NJK Contractors, Inc.*, No. 09-CV-4812 (RER), 2015 WL 1966355, at *20 (E.D.N.Y. May 1, 2015) (permitting opt-in Plaintiffs to obtain relief under NYLL, even though class certification under Federal Rule of Civil Procedure 23 never was approved).

at 182). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (citations omitted). While the party seeking to amend its pleading must explain any delay, the party opposing the amendment "bears the burden of showing prejudice, bad faith, and futility of the amendment." *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 766 (S.D.N.Y. 2018) (internal quotation marks and citations omitted).

The Court, in its discretion, grants Plaintiffs' motion to amend, and deems the SAC the operative pleading. The Court finds that Defendants have failed to make an adequate showing of prejudice. Their prejudice argument was based upon their inability to take depositions of the moving opt-in Plaintiffs. However, Defendants were provided, from every moving opt-in Plaintiff,[7] direct testimony via written affidavit (*see* ECF Nos. 144, 148 & 152) and a Questionnaire Declaration. (*See* ECF Nos. 154 & 156.) Defendants were able to cross examine at trial each of those Plaintiffs as to the contents of the sworn documents submitted, and Defendants obtained some key admissions from certain of the Plaintiffs at trial.

In addition, the consent forms signed by the opt-in Plaintiffs to join this case contained sufficiently broad language encapsulating state law claims (*see*, *e.g.*, Carr Consent, ECF No. 44 ("I hereby consent to the prosecution of any claims I may have under the Fair Labor Standards Act for wages, back pay, liquidated damages, costs and attorney's fees, and *other relief* against defendants") (emphasis added)). Thus, the Defendants were on notice that the moving opt-in

---

[7] Except for Samuel Wright, discussed *infra*.

Plaintiffs were entitled to seek redress in this lawsuit in addition to their FLSA claims.[8] Therefore, the Court, in its discretion, grants Plaintiffs' motion for leave to file the SAC to add claims brought under the NYLL for Plaintiffs Carr, Etienne, Foster, Logan-Williams, Martin, Reece, Rivera, Veliz and Wright.

## FINDINGS OF FACT[9]

The Court makes the following findings of fact after carefully considering the evidence before it:

### I. Defendant EPIC

Defendant EPIC, located at 2067 Broadway, between 71st and 72nd Street in Manhattan, is a privately-owned company which provides security guard services, employing approximately 300 to 400 security guards and other personnel. (Tr. at 332 (Lerner).)[10] The "crux" of EPIC's business is unarmed security guard work. (*Id*.) In the years 2009 through 2017, EPIC generated annual revenues in excess of $500,000; in 2017, EPIC's gross income was between $10 to $15 million. (*Id*. at 335-36.)

---

[8] In determining the scope of recovery permitted by opt-in plaintiffs, courts have considered the language of the consent forms used. For example, in *Hicks v. T.L. Cannon Corp.*, 35 F. Supp. 3d 329 (W.D.N.Y. 2014), the court found that opt-in plaintiffs could add NYLL claims to a FLSA lawsuit based upon the broad language contained in their opt-in consent forms. *Id*. at 339. The court held that the language was sufficiently broad to "encompass the state law claims brought in this lawsuit." *Id*. Further, the Court is persuaded that opt-in plaintiffs in an FLSA action may join in bringing state law (NYLL) claims because "they should have the same rights as the named Plaintiffs to have all their related claims adjudicated in the same forum." *See Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 90 (S.D.N.Y. 2001).

[9] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

[10] Citations to pages of the trial transcript are made in the format "Tr. at __." If not evident by context, the surname of the witness providing the trial testimony is included in a parenthetical following the page number.

Dr. Mark Lerner is EPIC's Chief Executive Officer ("CEO"). As CEO, he took steps to keep up to date with law and regulations in the security guard industry (including employment law) by keeping "a full set of New York State McKinney's laws and forms," receiving legal updates through West Publishing and subscribing to resources from a number of New York state agencies which provide him with updated information about wage and hour employment policies. (Tr. at 338 (Lerner).) He also subscribed to Mondaq, a legal service which provides reports about developments in labor law and wage-and-hour matters. (*Id*. at 338.) He has maintained these subscriptions for over twenty years. (*Id*. at 339.) Additionally, he has attended "many" security industry conferences, some of which involved personnel and payroll issues involving security guards. (*Id*. at 334.)

For the past five or six years, EPIC has maintained a fleet of approximately 35 vehicles. (Tr. at 331 (Lerner).) The vehicles are insured by EPIC: EPIC pays for the insurance of the vehicles, and security guards who drive them as part of their employment are listed on EPIC's insurance policy. (*Id*. at 339; Tr. at 358 (Falk).) Overall, of the hundreds of EPIC security guards who were employed by EPIC, only a minority of EPIC's security guards used EPIC vehicles to report to work sites. (Tr. at 401 (Falk).)

At trial, contracts between EPIC and 60 clients were introduced into evidence. (Defs.' Exs. A to III.) 34 of the client contracts provide that an EPIC vehicle will be present during the security guard's shift. (*See, e.g.*, Defs.' Exs. B, GG & EEE.) These vehicles are known as "radio motor patrol" ("RMP") vehicles (Tr. at 143 (Cullen)), which clients may request for their security needs. At a client's request, RMPs are used for patrol or deterrence purposes and/or as a shelter for security guards (Tr. at 158-59 (Cullen)). Thus, for these RMP sites, an EPIC security vehicle was required

to be at the worksite. The security guard assigned to the RMP sites would report to EPIC's headquarters to pick up the RMP, fill out paperwork relating to the RMP, drive the RMP to the site and then return the vehicle to EPIC's headquarters (again filling out paperwork).[11] (*See, e.g.,* Tr. at 201 (Cullen).)

EPIC only assigned to RMP sites security drivers with valid drivers' licenses, who were willing to drive. (Tr. at 181, 184 (Cullen).) RMP sites included, *inter alia*, Ray Catena car dealerships (Defs.' Exs. B & VV), Alice Fiore (Defs.' Ex. H), Garden State Plaza Mall (Defs.' Ex. ZZ), Yankee Clipper (Defs.' Ex. BBB), Ardsley Country Club (Defs.' Ex. L), Northstar Contracting/Grey Stone Hospital (Defs.' Ex. NN) and Leesel Transportation Corp. (Defs.' Ex. II.)

Client contracts for some other worksites indicated that an RMP was not required to be present on site ("non-RMP sites"). Therefore, security guards could commute directly to and from non-RMP sites; they did not have to report to EPIC's headquarters before or after their shift. (Tr. at 124 (Brown).) However, for at least some of those sites, EPIC provided employees with the option of using an EPIC vehicle to drive to the site (Tr. at 394 (Falk)), even though an EPIC vehicle was not required onsite. Non-RMP sites included, *inter alia,* Daytop Village (Defs.' Ex. III), the Red White & Blue thrift store (Defs.' Ex. E) and 99 Evergreen. (Defs.' Ex. U.)

EPIC asserts that it offered to security guards the use of an EPIC vehicle to travel between EPIC's headquarters and worksites (both RMP and non-RMP) as a convenience, if they wanted to drive, and/or as one of "several alternatives for them to get to work." (Tr. at 352, 375 (Falk).)

---

[11] On some occasions, an EPIC supervisor would drive an RMP to a site, instead of the security guard driving it there. (Tr. at 762-63 (Vicent).) However, this was an "extremely unusual" occurrence (about ten or twelve times per year), given the thousands of trips that EPIC security guards made in a year. (Tr. at 165 (Cullen).)

However, because EPIC was required to have RMPs at the RMP sites, EPIC benefitted by having security guards drive the RMPs to those sites. Indeed, Henry Cullen, EPIC's scheduling manager, testified that it was "easier" for EPIC to have security guards transport vehicles to worksites, rather than the alternative of having supervisors transport vehicles between sites. (Tr. at 166 (Cullen).)[12] Further, Cullen admitted that EPIC benefitted from having security guards fill the RMP vehicles with gasoline when driving them. (*Id*. at 210-11.)

In April 2016, EPIC implemented a new policy to begin paying some security guards for travel time between EPIC's headquarters and their worksites.[13] (Tr. at 355 (Falk).) Cullen testified that these payments for travel time only were available for travel to and from RMP sites. (Tr. at 189.) To calculate compensation for travel time, Cullen determined the amount of driving time for which a driver was eligible to be compensated; he did so by looking up worksites on Google Maps and using the estimate provided by Google Maps for the driving time between the worksite and EPIC's headquarters.[14] (*Id*. at 168-69.)

Cullen also testified about Vehicle Use Reports ("VURs"), which were paper forms filled out by security guards who drove EPIC's RMP vehicles, setting forth their driving times. (*See* Tr. at 175 (Cullen).) The VURs were destroyed, usually via shredding, after ninety days. (*Id*.) This

---

[12] Cullen testified that "it's much easier for EPIC just to have the security guard take the vehicle to the site than have the supervisors caravan with two cars to the site and leave together." (Tr. at 166.)

[13] The policy change was made because of this litigation. (Tr. at 399 (Falk).) Prior to the change, EPIC's regulations stated that EPIC did not provide transportation for employees to worksites, and that all employees were responsible to arrange their own transportation to arrive to worksites before the start of their scheduled shifts. (*Id*. at 362-63.)

[14] The compensated-for travel time was denoted on EPIC's payroll records as "TT/Misc.," which stands for "Travel Time/Miscellaneous." (*See* Tr. at 168 (Cullen).)

destruction practice continued until the summer of 2016, which was after this lawsuit was commenced. (*Id*. at 176.).[15]

## II.    <u>Defendant Selwyn Falk</u>

Defendant Falk is a Vice President at EPIC. (Tr. at 348 (Falk).) He acted as manager of the administrative office at EPIC, and as such, the payroll manager, scheduling manager and personnel manager reported to him. (*Id*. at 348-49.) He testified that, although he did not hire and fire EPIC security guards, he hypothetically could override a decision made by the personnel manager to do so. (*Id*. at 349-50.)

Falk was the corporate representative who signed EPIC's interrogatory responses. (Pls.' Ex. 10.) In addition, he was the corporate representative who signed about half of EPIC's contracts with its clients for security services. (Tr. at 371 (Falk).) Falk testified that, generally, he was not involved with personnel decisions about permitting security guards to drive EPIC vehicles to their work sites.[16] (*Id*. at 350-51.)

## III.    <u>Plaintiffs</u>

Individual findings as to each of the Plaintiffs and opt-in Plaintiffs are contained *infra*. The following findings relate to Plaintiffs as a group.

Whenever a Plaintiff used an EPIC vehicle to travel to a work site, he or she first would report to EPIC's headquarters to pick up the vehicle. (Tr. at 24 (Williams).) When security guards

---

[15] Cullen testified that, other than the VURs there was no other place where the driving time of security guards was memorialized. (Tr. at 175.)

[16] Falk was involved in the decision to authorize Plaintiff David Williams to use an EPIC vehicle to travel to and from Williams's worksite. (Tr. at 350-51 (Falk).) He said that his involvement was "[b]ased on the circumstances at the time" (*id*. at 351), namely, due to damage resulting from Hurricane Sandy which made the worksite inaccessible via public transportation. (*Id*. at 351, 391-92.)

arrived at EPIC's headquarters to pick up and drop off the vehicles, they were required to complete certain tasks, such as filling out paperwork and inspecting the vehicle. (*See, e.g.*, Tr. at 26 (Williams); Tr. at 65-66 (Walker).) This took approximately 15 to 20 minutes each time. (*See, e.g.*, Tr. at 28 (Williams); Tr. at 107-09 (Brown).) Further, prior to returning the vehicle to EPIC's headquarters, Plaintiffs would re-fill the car with gasoline, which they understood to be a requirement of their jobs. (*See, e.g.*, Tr. at 108-09 (Brown).)

Plaintiffs who used EPIC vehicles benefitted in several ways. Some Plaintiffs testified that the fact that they did not need to use their own personal vehicles to travel to and from work was a benefit to them; using an EPIC RMP vehicle rather than a personal vehicle meant they did not need to personally bear the costs of gasoline used or tolls paid for getting to and from the worksites.[17] (*See, e.g.*, Tr. at 755-56 (Vicent).) One plaintiff, Saul Veliz, testified that when he used his personal vehicle to travel to one site, he would have to pay $40 to $50 per day for gasoline and tolls. (Tr. at 701 (Veliz).) Thus, Veliz requested, and was granted permission, to use an EPIC vehicle so that he would not have to incur those costs. (*See id*. at 702.) Moreover, some Plaintiffs testified that they used EPIC vehicles due to the long driving distances to some of the sites. (*See* Tr. at 746 (David); Tr. at 754 (Vicent).)

The EPIC security guards also benefited by being covered by EPIC's insurance, in the instances where they got into accidents while driving to or from a worksite. (*See* Tr. at 759-60 (Vicent) ("Q. This was another benefit because if you had your own vehicle [that got into the accident], then you would have been responsible yourself [for the insurance]? A. Right.").)

---

[17] For example, Williams testified that he never had to use his own money to fill up the car, and that EPIC maintained an account or kept a debit card onsite with a gasoline station in the area which would automatically be charged when he filled up the car with gasoline. (Tr. at 43-44 (Williams).)

Some employees who did not own personal vehicles needed to use an EPIC vehicle to drive to worksites, due to disruptions in mass transit. For example, certain Plaintiffs testified that travelling to worksites located in Far Rockaway, New York (*e.g.*, Daytop Village) was difficult, due to the aftermath of Hurricane Sandy. (*See, e.g.*, Tr. at 56-57 (Williams); Tr. at 546-47 (Etienne).) Plaintiff Vicent candidly acknowledged that the EPIC vehicles were supplied to employees as a "courtesy," and that he could have taken his own vehicle to certain worksites instead of an EPIC vehicle.[18] (*Id*. at 754, 758.)

Assessing all of the Plaintiffs' and opt-in Plaintiffs' written and live testimony, the Court finds that, for non-RMP sites, the travel time to and from those sites was equivalent to normal commuting time. The Court finds that the EPIC vehicles were provided to employees commuting to those non-RMP sites as a courtesy and conferred a benefit on those employees. The RMP vehicles were being used as part of EPIC's employees' normal commute to non-RMP worksites.

With respect to RMP sites, however, the Court credits the testimony of Plaintiffs and opt-in Plaintiffs regarding driving time to and from those sites. The Court finds that the time spent from the time the security guard reported to EPIC's headquarters to pick up the RMP vehicle to the time that the vehicle was returned to EPIC's headquarters, including time spent filling the EPIC vehicles with gasoline and inspecting the vehicle, was time required in the performance of security guards' duties for RMP sites. These employees were conferring a benefit on EPIC by delivering the RMPs to the worksites and filling them with gasoline. The EPIC vehicles were part and parcel of the work performed at the RMP sites since the vehicles were required for the motor

---

[18] Vicent's testimony on this point related to a non-RMP site.

patrolling that was done. Since the vehicles were required for EPIC's business purposes, they essentially were tools used at RMP sites.

**CONCLUSIONS OF LAW**[19]

The Court makes the following conclusions of law after carefully considering the parties' written submissions, the arguments of counsel and the controlling law on the issues presented.

**I.   For RMP Sites Only, Plaintiffs Are Entitled To Be Compensated For Travel Time**

**A.   Legal Standards**

The Portal-to-Portal Act,[20] 29 U.S.C. § 254, provides that normal commute time to a work site is not usually compensable, *Kavanagh v. Grand Union Company, Inc.*, 192 F.3d 269, 271-72 (2d Cir. 1999) (employers are not required to compensate employees for their normal travel between home and work), even when an employee is using an employer's vehicle for the commute. *See Colella v. City of New York*, 986 F. Supp. 2d 320, 338 (S.D.N.Y. 2013). "An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites. Normal travel from home to work is not worktime." 29 C.F.R. § 785.35. This also is true regardless of the length of time of the commute. For example, in *Kavanagh,* the Second Circuit held that travel time was "normal" (and therefore outside the scope of the FLSA), even though the plaintiff (who performed

---

[19] This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the FLSA, 29 U.S.C. § 216. There is no dispute that the jurisdictional requirements of the FLSA have been met. The Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

[20] The Portal to Portal Act is an amendment to the FLSA that articulates various clarifications of provisions in the FLSA. "The Portal-to-Portal Act, which amended the FLSA in 1947, represented an attempt by Congress to delineate certain activities which did not constitute work, and therefore did not require compensation." *Reich v. New York City Transit Auth.*, 45 F.3d 646, 649 (2d Cir. 1995).

mechanical services in defendant's supermarkets) commuted five and one-half to nine and one-half hours a day depending on the location of the supermarkets to which he was dispatched. 192 F.3d at 272-73, 275 ("Although Kavanagh's situation strikes us as inequitable, nothing in the pertinent statutes and regulations requires Grand Union to compensate Kavanagh for his travel time.").[21]

Even if an employee uses the employer's vehicle to commute to work, the normal time spent traveling to and from the worksite is not compensable under the FLSA. *See Manners v. State of New York*, 183 Misc. 2d 382, 390, 703 N.Y.S.2d 375, 380 (Ct. Cl. 2000), *aff'd*, 285 A.D.2d 858, 727 N.Y.S.2d 547 (3d Dep't 2001) ("Simple commuting to and from work in an employer's vehicle, without more, is not compensable under the FLSA and is not made so by an employer restricting or prohibiting the personal uses to which such a vehicle may be put during the course of the commute."). *See also* 29 U.S.C. § 254(a) ("the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee").

Certain federal regulations address circumstances when a commute transforms into compensable work under the FLSA. For example, if labor performed before a commute supports

---

[21] Also, in circumstances where an employee is required to drive an employer's vehicle to work, and transports other employees during the trip, travel time is not compensable, since "their task was no different than what a commuter would normally do on a drive to work with or without other passengers." *See Hodge v. Lear Siegler Servs., Inc.*, No. 06-CV-263 (MHW), 2008 WL 2397674, at *10 (D. Idaho 2008).

the employees' "principal activity or activities," the commute becomes compensable. 29 C.F.R. §§ 790.6 & 790.8. Also, the regulations suggest that where an employer requires its employee to report to a third location (hereinafter a "waystation") after leaving his residence and before arriving at the work site—for instance, "to pick up and carry tools"—the time spent traveling from the waystation to the worksite can be compensable. 29 C.F.R. § 785.38. The regulations state in full:

> Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel time from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice. If an employee normally finishes his work on the premises at 5 p.m. and is sent to another job which he finishes at 8 p.m. and is required to return to his employer's premises arriving at 9 p.m., all of the time is working time.

29 C.F.R. § 785.38. The workday, then, would begin at the required reporting time.

A case cited by Plaintiffs, *Pichardo v. Hoyt Transp. Corp.*, No. 17-CV-3196 (DLI), 2018 WL 2074160 (E.D.N.Y. Jan. 31, 2018), is illustrative. The plaintiff in *Pichardo* was a school bus driver who began and ended his work day at the defendant's bus lot in the Bronx. *Id*. at *1. Although his primary duty was transporting children between their homes and schools, the court found that the time the plaintiff spent traveling between defendant's parking site and his home and between defendant's parking site and his final stop of each day was compensable under the FLSA. *Id*. at **4-5. The court held: "A bus driver transporting his employer's bus to and from its parking site is an activity that is required of the driver—it is necessarily and primarily pursued to benefit the employer." *Id*.

The NYLL does not differ from the FLSA as to the compensation of commutes. *See, e.g.*, *Beecher v. TWC Admin. LLC*, No. 15-CV-00154 (WMS) (JJM), 2016 WL 11113685, at *6 (W.D.N.Y.

Aug. 22, 2016), *report and recommendation adopted* (Oct. 18, 2016) (Text Order, ECF No. 79) ("the New York State Department of Labor . . . typically refers to the FLSA and the regulations promulgated thereunder when interpreting an employee's rights for compensation for commute time under the NYLL"). *See also Beecher*, 2016 WL 11113685, at *6 (citing New York Department of Labor opinion letter RO-10-0068) (where technician who drives company owned truck parked at rental space, was required to travel from home to rental space to get truck each morning, and then travel from rental spot to first job assignment, travel time between rental space and job site is compensable).

B. **Application**

The Court finds that, for those Plaintiffs who worked at RMP sites and drove an RMP to and from those sites, the driving time is compensable.[22] For RMP sites, the EPIC vehicle, a white vehicle with blue stripes lights on the roof (*see* Tr. at 217-18 (Foster)), was a tool required at the worksite. Cullen referred to EPIC vehicles as "[e]quipment necessary for the site" during his trial testimony.[23] (Tr. at 180-81 (Cullen).) Therefore, before starting a shift, a security guard needed to first report to EPIC's headquarters (the waystation), whereupon the security guard performed certain tasks (*e.g.*, filling out paperwork and inspecting the vehicle) in order to pick up the RMP. Thus, since time spent traveling between a waystation to a worksite is compensable, the time spent commuting between EPIC's headquarters and the RMP worksite is compensable.

---

[22] The only exceptions are the Deepdale and Forest Hill Gardens sites, which are *sui generis*. As set forth *infra*, an EPIC vehicle was permanently kept at those sites at all times and thus the EPIC security guards did not need to transport an RMP to those sites as part of their job duties. (*See* discussions regarding Michael Mitchell and Warren Richardson, *infra*.)

[23] EPIC thus is mistaken when it argues in its Post-Trial Memorandum that Plaintiffs "were not transporting any equipment." (Defs.' Post-Trial Mem., ECF No. 169, at 30.) The RMP was equipment.

For non-RMP sites, the Court finds that the time spent driving to and from those sites is not compensable. The Court likens the time spent driving to and from those sites as normal commuting time, which is not compensable. Since those sites did not require a vehicle, the EPIC vehicles were not "tools" at non-RMP sites. While some Plaintiffs preferred to drive EPIC vehicles to the non-RMP sites due to the benefits they received from doing so (*e.g.*, not paying for gasoline and tolls), the security guards could have commuted to those sites using public transportation or their own personal vehicles.

II.     **Plaintiffs Are Entitled to Be Compensated At The Average Weekly Minimum Wage Rate And For Overtime For Travel To RMP Sites**

   A.  **Legal Standards**

An employee bringing an action for unpaid wages under the FLSA or NYLL has the burden of proving he was not adequately compensated. *Carrasco-Flores v. Comprehensive Health Care & Rehab. Servs., LLC*, No. 12-CV-5737 (ILG), 2014 WL 4954629, at *3 (E.D.N.Y. Oct. 2, 2014). Employers are required to "make, keep, and preserve" records of employee wages and hours. 29 U.S.C. § 211(c). However, if an employer fails to keep or produce records, the plaintiff may satisfy his burden by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Carrasco-Flores*, 2014 WL 4954629, at *3. A plaintiff may satisfy this evidentiary burden "by relying on recollection alone." *Id.*

Federal law mandates that employees be paid at least minimum wage for the first 40 hours worked in a given work week. 29 U.S.C. § 206(a). The Second Circuit has established that a plaintiff does not have a claim under the FLSA for hours worked below 40 in a given week (regardless of whether the plaintiff worked overtime or not), unless the average hourly wage rate paid to such plaintiff falls below the federal minimum wage rate. *Lundy v. Catholic Health Sys. of*

*Long Island Inc.*, 711 F.3d 106, 115-16 (2d Cir. 2013); *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 494 (2d Cir. 1960).

Like the FLSA, the NYLL mandates that employees be paid at least minimum wage for the first 40 hours worked in a given work week. NYLL § 652(1). In addition, like under the FLSA, Plaintiffs are entitled to recover under the NYLL only if their average hourly pay rate in a given week was below the New York minimum wage rate. *See Huang v. GW of Flushing I, Inc.*, No. 17-CV-3181 (PKC) (JO), 2019 WL 145528, at *5 (E.D.N.Y. Jan. 9, 2019).

Section 207 of the FLSA requires an employer to pay any employee who works more than 40 hours per week a premium for overtime hours "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The fact that an employer pays wages above the statutory minimum wage rate set by Congress is not a defense to an employer's non-payment of overtime compensation. *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 42 (1944).

Like the FLSA, the NYLL requires that employers provide time-and-a-half (of the regular rate) compensation for employees who work more than 40 hours per week, and adopts the same methods used by the FLSA for calculating overtime damages. N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.

**B. <u>Application</u>**

Plaintiffs seek compensation for those hours under 40 per week which they spent driving to and from worksites, at the minimum wage rate under the FLSA, which is appropriate. However, they also seek recovery under the NYLL for "unpaid straight time up to [Plaintiffs'] full wage rates." (Pls'. Post-Trial Mem., ECF No. 170, at 33.) The Court finds that Plaintiffs are not entitled

to such recovery under the NYLL, but only are entitled to recovery up to the minimum wage rate under the NYLL for hours per week under 40. *See Contrera v. Langer*, 314 F. Supp. 3d 562, 570 (S.D.N.Y. 2018).[24] The NYLL in Article 19, § 650 *et seq.*, upon which Plaintiffs rely in their operative pleading (*see* SAC, ¶ 103), permits recovery for minimum wage, NYLL § 652, but contains no provision for recovery of unpaid straight time. *See McGlone v. Contract Callers Inc.*, 114 F. Supp. 3d 172, 173 (S.D.N.Y. 2015) (holding, in refusing to award damages at plaintiffs' regular rate for non-overtime hours, "[t]he provisions of Article 19 do not specify any relief that is greater than the minimum wage.").

To determine whether an employee was compensated above the required federal minimum wage, the Court will consider the employee's average hourly wage, which is determined by dividing the total renumeration for employment in any workweek by the total number of hours actually worked in that workweek for which such compensation was paid. *Huang*, 2019 WL 145528, at *5 (internal quotation marks and citations omitted). The same calculation will be considered under the NYLL. *Id*. at n.4.

During the relevant period, the federal minimum wage was $7.25 per hour and the New York State minimum wage for workers in New York City ranged between $7.25 to $9.70 per hour. 29 U.S.C. § 206(a)(1)(C); NYLL § 652. Therefore, to state a FLSA minimum wage a plaintiff must

---

[24] Plaintiffs seek to distinguish *Contrera* by arguing that, in *Contrera*, the plaintiffs were seeking to recover their "full amount of wages" under NYLL § 198(3), which is not a substantive provision. (Pls.' Post-Trial Mem. at 33.) Plaintiffs assert that there is a substantive provision of the NYLL, Section 193, relating to unlawful deductions from wages, that permits recovery for unpaid straight time. (Pls.' Post-Trial Mem. at 34; Pls.' Resp. Mem., ECF No. 187, at 14-15.) Plaintiffs are mistaken. Section 193 of the NYLL prohibits employers from making deductions from wages, except in limited circumstances. *See* NYLL § 193. However, section 193 "applies to amounts *deducted* from wages, not *unpaid* wages and severance." *O'Grady v. BlueCrest Capital Mgmt. LLP*, 111 F. Supp. 3d 494, 506 (S.D.N.Y. 2015) (citations omitted), *aff'd*, 646 F. App'x 2 (2d Cir. 2016) (emphasis in original).

prove that, in a given week, taking into account travel time to and from RMP sites, the total amount he or she was paid divided by the number of hours he or she worked was less than $7.25 per hour, and to state a NYLL minimum wage claim, a plaintiff must show that his or her average hourly pay was less than the applicable minimum wage at the time.

Since under both the FLSA and NYLL, employers must pay employees 1.5 times their regular rate for each hour worked in excess of 40 hours per week, the Court will award overtime to Plaintiffs for unpaid overtime to the extent the travel time to and from RMP sites results in any Plaintiff working more than 40 hours in a given week.

**III.**    **Plaintiffs Are Not Entitled To Liquidated Damages**

    **A.**   **Legal Standards**

Under the FLSA, "[a]ny employer who violates the provisions of . . . section 207 . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). However, the Portal-to-Portal Act "affords district courts discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate . . . FLSA." *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (quoting 29 U.S.C. § 260).

The NYLL also allows for liquidated damages. An employee can recover liquidated damages "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law . . . ." NYLL § 198(1-a).

**B. Application**

The Court declines to award liquidated damages under either the FLSA or the NYLL. The evidence offered a trial shows that Defendants acted in good faith and had objectively reasonable grounds for believing that driving time between EPIC's headquarters and worksites was not compensable. In support of this finding, the Court credits Dr. Lerner's testimony that he, as EPIC's CEO, took affirmative steps to monitor legal standards developments in labor law over at least the past twenty years, including attending conferences and subscribing to and utilizing research databases and newsletters. These efforts demonstrate a good faith effort on EPIC's part to comply with labor laws. In light of the fact that the issues surrounding how to properly compensate for driving time are not straightforward, EPIC had an objectively reasonable basis for its belief that it did not need to compensate for travel time between EPIC's headquarters and worksites. Further, the policy change EPIC implemented in April 2016 to pay security guards for driving time to and from RMP sites demonstrates EPIC was acting in good faith to comply with the law. Therefore, the Court finds that Plaintiffs are not entitled to liquidated damages.

**IV. Statutes Of Limitation**

**A. Legal Standards**

The statute of limitations for "a cause of action arising out a willful violation" of the FLSA is three years. 29 U.S.C. § 255(a). For non-willful violations, the statute of limitations is two years. *Id*. To prove a willful violation, an employee must establish "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133 (1988). Reckless disregard "involves actual knowledge of a legal requirement, and deliberate disregard of the risk that one is in violation."

*Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 937-38 (S.D.N.Y. 2013) (internal quotation marks and citation omitted); *see also*, *e.g.*, *Pinovi v. FDD Enters., Inc.*, No. 13-CV-2800 (GBD) (KNF), 2015 WL 4126872, at *4 (S.D.N.Y. July 8, 2015) ("Recklessness is defined as, at the least, an extreme departure from the standards of ordinary care, to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." (internal quotation marks and citation omitted)). "If an employer acts unreasonably, but not recklessly, in determining its legal obligation, its action should not be considered willful." *Parada v. Banco Industrial de Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014) (internal quotation marks, citation, and brackets omitted); *see also Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) (explaining that a showing of "[m]ere negligence is insufficient" to establish willfulness).

The statute of limitations is six years under the NYLL. NYLL § 663(3).

**B. <u>Application</u>**

For Plaintiffs with NYLL claims, the Court will apply a six-year statute of limitations, since it is longer than the FLSA statute of limitations. For Plaintiffs with FLSA claims, the Court will apply a two-year statute of limitations since the Court, assessing the credibility of witnesses, and based upon its review of the record evidence, finds that Defendants' conduct was not willful. In any event, there are no Plaintiffs who assert only FLSA claims who would benefit from the longer FLSA statute of limitations.

**V.   Successful Plaintiffs Are Entitled To Prejudgment Interest**

   **A.  Legal Standards**

"In an action to enforce a federal right, the decision whether to award prejudgment interest and the rate to be applied if such interest is granted, are matters ordinarily left to the discretion of the district court." *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 213 (S.D.N.Y. 2001), *aff'd*, 48 F. App'x 363 (2d Cir. 2002) (citations omitted). For the FLSA claims, which are under federal law, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 may be applied, and the interest may be compounded annually. *See Robinson v. Instructional Sys., Inc.*, 80 F. Supp. 2d 203, 208 (S.D.N.Y. 2000).

"A plaintiff who prevails on a NYLL wage claim is entitled to prejudgment interest on any 'underpayment' of wages." *Salustio v. 106 Columbia Deli Corp.*, 264 F. Supp. 3d 540, 557 (S.D.N.Y. 2017) (quoting NYLL § 198(1-a)). For claims under the NYLL, the 9% interest rate provided in N.Y. C.P.L.R. §§ 5001, 5004 applies. Where unpaid wages "were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. § 5001(b) (McKinney 2019).

   **B.  Application**

The Court finds that the Plaintiffs who are entitled to recover also are entitled to prejudgment interest. *See Gierlinger v. Gleason*, 160 F.3d 858, 873-74 (2d Cir. 1998) ("[t]o the extent . . . that the damages awarded to the plaintiff represent compensation for lost [back] wages, 'it is ordinarily an abuse of discretion *not* to include pre-judgment interest'") (citation omitted) (emphasis in original). Interest at the 9% New York statutory rate will be applied to

amounts awarded in favor of Plaintiffs who are asserting NYLL claims (in addition to FLSA claims). For those Plaintiffs only asserting FLSA claims, the federal interest rate will be applied.

## VI. Defendant Falk Is Not Liable

### A. Legal Standards

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). This is an expansive definition with "striking breadth." *Hernandez v. Jrpac Inc.*, No. 14-CV-4176, 2016 WL 3248493, at *21 (S.D.N.Y. June 9, 2016) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)). An individual may simultaneously have multiple "employers" for the purposes of the FLSA. *See* 29 C.F.R. § 791.2(a). Furthermore, "[e]ach employer is jointly and severally liable for all back wages and liquidated damages." *Hernandez*, 2016 WL 3248493, at *21 (citing *Moon v. Kwon*, 248 F. Supp. 2d 201, 236-38 (S.D.N.Y. 2002)).

"[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" *Barfield*, 537 F.3d at 141 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). The determination of whether defendants are plaintiffs' joint employers is to be based on "the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *see also Barfield*, 537 F.3d at 141-42 (employment is "to be determined on a case-by-case basis by review of the totality of the circumstances"). "Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'" *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).

"When it comes to 'employer' status under the FLSA, control is key." *Lopez v. Acme Am. Envtl. Co.*, No. 12-CV-0511 (WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012); *see also Herman*, 172 F.3d at 135 ("[C]ontrol of employees is central to deciding whether appellant should be deemed an employer.").

The "economic reality" test compels courts to consider a range of factors in resolving whether a defendant qualifies as an employer under the FLSA, including "whether the individual: '(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Gillian v. Starjem Rest. Corp.*, No. 10-CV-6056 (JSR), 2011 WL 4639842, at *4 (S.D.N.Y. Oct. 4, 2011) (citing *Carter*, 735 F.2d at 12). "No one of the four factors standing alone is dispositive. Instead the 'economic reality' test encompasses the totality of circumstances, no one of which is exclusive." *Herman*, 172 F.3d at 139 (internal citation omitted).

The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA. *Compare* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . .."), *with* N.Y.L.L. § 190(3) ("'Employer' includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."). "Neither the New York Court of Appeals nor the Second Circuit has decided whether the tests for 'employer' status are the same under the FLSA and the NYLL. However, district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 511

(S.D.N.Y. 2015) (citations and internal quotation marks omitted). The Court therefore will apply the economic reality analysis to both statutes. *See Hernandez*, 2016 WL 3248493, at *22 (citing *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013)).

### B. Application

Plaintiffs have not met their burden of proof to show that, under the economic reality test, Falk is an employer for the purposes of liability under the FLSA (and NYLL). It is not clear why Plaintiffs chose to add Falk as a defendant when they amended their pleading, as opposed to naming Lerner, who was EPIC's CEO. While it is true that Falk was the corporate representative who signed EPIC's interrogatory responses (Pls.' Ex. 10), and that Falk was a corporate representative who signed about half of EPIC's contracts with its clients for security services (Tr. at 371), those facts do not make him liable under the FLSA or the NYLL.

Applying the four relevant factors, Plaintiffs only have made a showing as to one. That is, Plaintiffs obtained an admission from Falk that, even though he never hired or fired security guards, he had the hypothetical power to do so, since the personnel manager at EPIC reported to him. (Tr. at 349-50.) However, Plaintiffs have not shown that Falk supervised and controlled Plaintiffs' work schedules or conditions of employment, that he determined their rate and method of payment or that he maintained their employment records. *See Gillian*, 2011 WL 4639842, at *4. Significantly, it was EPIC's CEO Lerner, not Falk, who made the decision in 2016 to change EPIC's policy to pay security guards for driving to RMP sites. (Tr. at 399-400 (Falk).)

In the corporate structure of EPIC, the economic reality is that Falk was merely part of a corporate hierarchy and that Falk did not exercise control over the Plaintiff security guards. *See Vasto v. Credico (USA) LLC*, No. 15-CV-9298 (PAE), 2016 WL 4147241, at *6 (S.D.N.Y. Aug. 3, 2016)

("Generally, corporate officers and owners held to be employers under the FLSA have had some direct contact with the plaintiff employee, such as personally supervising the employee's work, including determining the employee's day-to-day work schedules or tasks, signing the employee's paycheck or directly hiring the employees."). Under the totality of the circumstances, and looking at the economic realities, the Court does not find Falk liable for any of Defendant EPIC's wage and hour law violations.

## INDIVIDUAL PLAINTIFFS' AND OPT-IN PLAINTIFFS' DAMAGES ANALYSES

This final section of this Opinion applies the foregoing factual findings and legal conclusions to each of the Plaintiffs and opt-in Plaintiffs. This section also includes specific factual findings germane to each individual.[25] Finally, this section includes the damages, if any, being awarded to each of the Plaintiffs and opt-in Plaintiffs. In making the damages awards, the Court carefully considered Plaintiffs' Damages Spreadsheet,[26] as well as Defendants' objections and corrections thereto.[27]

The Court is basing its damages calculations of the driving times upon Plaintiffs' recollections, which recollections are incorporated into Plaintiffs' Damages Spreadsheet. The Court does so for two reasons. First, the Court finds Plaintiffs' testimony about driving times

---

[25] On December 5, 2018, certain Plaintiffs submitted affidavits of their direct examinations, with one being submitted on December 6 with leave of Court. (*See* ECF Nos. 144, 148.) Citations to these affidavits will be made using each Plaintiff's surname followed by "Aff." On December 6, 2018, Questionnaire Declarations were submitted by many Plaintiffs. (*See* ECF No. 154.) Citations to the Questionnaire Declarations will be made using each Plaintiff's surname followed by "Decl."

[26] References hereinafter to the "Damages Spreadsheet" are to the amended damages spreadsheet submitted by Plaintiffs on February 15, 2019, at ECF No. 186-1. The Damages Spreadsheet contains for each Plaintiff the work site(s) for which the Plaintiff seeks damages, plus the hours worked per week (including Plaintiff's own assessment of travel time) for each site and the Plaintiff's wages and wage rates.

[27] Defendants' objections and corrections were filed on February 20, 2019 at ECF No. 188.

credible. Even where the distance between EPIC's headquarters and a given job site is not long in miles, given the traffic in and around Manhattan, driving times can be quite lengthy. Second, because the VURs, which memorialized the Plaintiffs' actual driving times were destroyed by Defendants after this case was commenced, legal precedent supports the Court's approach.[28]

1.  **Adrian Brown**

Brown was employed by EPIC as a security guard from February 2015 to December 2016. (SAC ¶ 46.) Brown worked at the following worksites: (1) Avalon Bay Princeton;[29] (2) William Floyd Parkway (Dutra Group); (3) Ray Catena; (4) Leesel Bus Depot; and (5) Ardsley Country Club. (Damages Spreadsheet at 3; *see also generally* Tr. at 93-100 (Brown).) Of these sites, Plaintiffs only assert that Avalon Bay Princeton, Ray Catena, Leesel and Ardsley Country Club were RMP sites. (Damages Spreadsheet at 3.)

Based upon the EPIC client contracts, the following were RMP sites: Ray Catena (Defs.' Ex. B); Leesel (Defs.' Ex. II) and Ardsley Country Club (Defs.' Ex. L). There is no contract in evidence relating to the Avalon Bay Princeton site (located at 253 Witherspoon Street) where Brown worked. (Damages Spreadsheet at 3; Catina Decl., ECF 188-1, ¶ 6(ix).)

---

[28] "[I]t is the employer who has the statutory duty to 'keep proper records of wages, hours . . . and who is in position to know and produce the most probative facts concerning the nature and amount of work performed." *Jemine v. Dennis*, 901 F. Supp. 2d 365, 376 (E.D.N.Y. 2012) (internal quotations and citations omitted). "[I]f an employer's records are inaccurate or inadequate, an employee need only present sufficient evidence to show the amount and extent of [the uncompensated work] as a matter of just and reasonable inference. An employee's burden in this regard is not high. It is well settled among the district courts of this Circuit, and we agree, that it is possible for a plaintiff to meet this burden through estimates based on his own recollection." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (internal citations and quotations omitted).

[29] There are a number of Avalon Bay work sites in different cities. Where relevant, they are denoted by the city in which the work site is located, *i.e.*, Avalon Bay Princeton.

With respect to Avalon Bay Princeton, Plaintiffs point to an EPIC call-in sheet from February 5, 2015 where there is a notation with Brown's name for this site stating "UNARMED UNIFORM SEC. OFF. W/RADIO MOTOR." (Call In Sheet, Defs.' Ex. JJJ, at 3441.) The Court finds that this document is evidence that Brown was required to drive an RMP to the Avalon Bay Princeton site on February 5, 2015.[30] However, the Court also finds that Plaintiffs have not met their burden of proof to show that Brown was required to drive an RMP to this site on other days.

The Court awards Brown the sum of $7,850.00 based upon unpaid minimum wages and overtime for his travel to and from RMP sites, plus prejudgment interest in the amount of $2,210.00.

2. **Jimmy Butler**

Butler worked at EPIC from approximately November 3, 2016 to December 17, 2017. (Butler Aff., ECF No. 144-1, ¶ 1; Butler Decl., ECF No. 154-3, ¶ 1.) Butler asserted that he worked at three worksites to and from which he was required to drive an EPIC vehicle: Restaurant Depot, Avalon Bay and Livingston Builder. (Butler Aff. ¶ 5; Butler Decl. ¶ 5.) However, the Damages Spreadsheet only seeks damages for his work at two sites: Avalon Bay and Livingston Builder. (Damages Spreadsheet at 28.) This Avalon Bay site is not listed by Plaintiffs on their Damages Spreadsheet as an RMP site (*see id*.), and Butler therefore is not entitled to recovery for his time spent traveling to and from Avalon Bay.

Butler seeks recovery under the FLSA for overtime hours he spent traveling to and from the Livingston Builder site, which is alleged by Plaintiffs to be an RMP site. (Damages Spreadsheet

---

[30] The Court has credited Brown for his travel time to and from the Avalon Bay Princeton site on February 5, 2015.

at 28.) The Livingston Builder site was located on the Upper East Side of Manhattan (across town from EPIC's headquarters). There is no contract in evidence for the Livingston Builder site where Butler worked. (Catina Decl. ¶ 6(xiv).) Rather, Livingston Builder is claimed by Plaintiffs to be an RMP site based on Butler's testimony that the vehicle was used by him as a shelter. (Tr. at 670-71 (Butler).)

The Court does not find Butler to be credible. Although his Affidavit states that he "patrolled the perimeter of the area" with the vehicle (Butler Aff. ¶ 9), Butler admitted on cross-examination that EPIC "didn't ask [him] to" patrol the site using the vehicle. (Tr. at 671 (Butler).) The Court finds that Livingston Builder was not an RMP site, and thus does not award any recovery to Butler.

### 3.    Shakiema Cadora

Cadora worked for EPIC from June 11, 2014 until December 30, 2015. (Cadora Aff., ECF No. 144-2, ¶ 1; Cadora Decl., ECF No. 154-4, ¶ 1). She was assigned to the Floyd Bennett Field worksite during her entire employment with EPIC, about 79 weeks. (Cadora Aff. ¶ 3; Cadora Decl. ¶ 6.) The EPIC client for whom Cadora provided security guard services was RAAD Construction. (*See* Damages Spreadsheet at 38-40.)

The EPIC contract with RAAD Construction does not require an RMP. (Defs.' Ex. D.) Plaintiffs base their assertion that Floyd Bennett Field required an RMP upon trial testimony by EPIC's Cullen. (Damages Spreadsheet at 38.) However, that testimony was based upon an EPIC call-in sheet for October 1, 2015 regarding Floyd Bennett Field, which related to different security guards, named Sharif Uddin and Jovan Williams. (Pls.' Ex. 8 at PT_3353 ("UNARMED UNIFORM SEC. OFF. W/RADIO MOTOR"); *see* Tr. at 156-61.) There is a call-in sheet for the very same day

(October 1, 2015) regarding Floyd Bennett Field which is specific to Cadora herself and states, "LEV. 2 UNARMED UNIFORM SECURITY OFF.," without any mention of an RMP.[31] (Pls.' Ex. 8 at PT_3396.)

The Court finds that Cadora is not credible. She testified at trial that she was required to drive to the Floyd Bennett Field site every single day. (1/7/19 Tr. at 39.) However, she acknowledged that some of her fellow EPIC guards at the Floyd Bennett Field site arrived by bus. (*Id*. at 36.) Moreover, the language of her Declaration, which was dated November 29, 2018, suggests that she was not required to drive to the site every day. (Cadora Decl. ¶ 7 ("*On the days I was required* to drive an EPIC vehicle between EPIC's headquarters and Floyd Bennett Field . . ." (emphasis added).)

In these circumstances, assessing Cadora's credibility and considering the record evidence, the Court finds that Plaintiffs have not met their burden of proof to show that Cadora was required to drive an RMP to the site where she worked. Thus, Cadora is not entitled to any recovery in this case.

**4.      Sharon Carr**

Carr worked at EPIC from October 18, 2013 to December 9, 2013. (Carr Aff., ECF No. 144-3, ¶ 1; Carr Decl., ECF No. 154-5, ¶ 1.) Carr worked at the following worksites: (1) Garden State Plaza[32] (Carr Aff. ¶ 4; Carr Decl. ¶ 6; Tr. at 261 (Carr)); and (2) Seagirt Beach (a Dutra Group

---

[31] The different references in the call-in sheets for October 1, 2015 can be explained by the fact that, as Cadora testified at trial, there were four security guards at the Floyd Bennett Field site. (1/17/19 Tr., ECF No. 165, at 31.)

[32] Reflected in payroll records at "Whiting-Turner." (Pls.' Ex. 1 at PT_264.)

worksite).[33] (Carr. Aff. ¶ 6.; Tr. at 261 (Carr).) Garden State Plaza was an RMP site. (Defs.' Ex. ZZ.) Although there is no contract in evidence for the Dutra site where Carr worked (Catina Decl. ¶ 6(v)), Defendants admit that the Dutra site where Carr worked was an RMP site. (Defs.' Spreadsheet, ECF No. 188-3.)

The Court awards the sum of $1,040.00 to Carr based upon unpaid minimum wages and overtime for her travel to and from RMP sites, plus prejudgment interest in the amount of $495.00.

5.    **Roger David**

David worked for EPIC during the period January 30, 2014 to September 24, 2016. (David Aff., ECF No. 144-5, ¶ 1; David Decl., ECF No. 154-6, ¶ 1.) David worked at the following sites, among others: Selby Transportation, Rosenthal Jewish, Kennedy Catholic High School, an art gallery in Orangeburg, NY[34] and Big Apple Circus. (David Aff., ¶¶ 4-9; David Decl., ¶ 5.) Selby Transportation, Kennedy Catholic High School and Big Apple Circus were RMP sites. (Defs.' Exs. O, HH & II.)

The contract for Rosenthal Jewish reflects that it is not an RMP site. (Def Ex. YY.) However, in their Damages Spreadsheet (at 30), Plaintiffs assert that it is an RMP site by referring to an EPIC call-in sheet from April 30, 2015 where there is a notation with David's name for this site stating, "TEMP. UNIFORM SEC. SERVICE WITH R.M.P." (Call In Sheet, Defs.' Ex. JJJ, at 7473.) The Court finds that this document is evidence that David was required to drive an RMP to the Rosenthal

---

[33] Carr's payroll records list the site as the "Dutra Group," the client who was performing onsite work on the beach. (Pls.' Ex. 1 at PT_264.)

[34] The art gallery is the "Phyliss Dodge" worksite. (David Aff. ¶ 8.)

Jewish site on April 30, 2015.[35] However, the Court also finds that Plaintiffs have not met their burden of proof to show that David was required to drive to this site on other days.

There is no contract in evidence for the Phyliss Dodge site. (Catina Del. ¶ 6(xvii).) Plaintiffs point to an EPIC call-in sheet from March 17, 2016 where there is a notation with David's name for this site stating, "TEMP. UNIFORM SEC. SERVICE WITH R.M.P." (Call In Sheet, Defs.' Ex. JJJ, at 22974.) The Court finds that this document is evidence that David was required to drive an RMP to the Phylliss Dodge site on March 27, 2016.[36] However, the Court also finds that Plaintiffs have not met their burden of proof to show that David was required to drive to this site on other days. In reaching this finding, the Court is mindful of David's trial testimony that he "did not have to patrol the [Phyllis Dodge site] area in the Epic vehicle." (Tr. at 735.)

David seeks damages in this case under the FLSA only. (Damages Spreadsheet at 30-31.) The Court awards him FLSA damages in the amount of $1,285.00 based upon unpaid overtime for his travel to and from RMP sites, plus prejudgment interest at the federal rate in the amount of $90.00.

## 6.    Junior Etienne

Etienne worked for EPIC for a few weeks during the month of February 2013. (Etienne Aff., ECF No. 144-6, ¶ 1; Etienne Decl., ECF No. 154-7, ¶ 1; Tr. at 529 (Etienne).) Etienne worked at only one site for EPIC, a beach site in Far Rockaway, New York for three weeks. (Etienne Aff. ¶ 4; Etienne Decl. ¶¶ 5-6; Tr. at 546 (Etienne).) Although he testified that he did not remember the name, address or other identifying information about either the worksite or the client, the

---

[35] The Court has credited David for his travel time to and from the Rosenthal Jewish site on April 30, 2015.

[36] The Court has credited David for his travel time to and from the Phylliss Dodge site on March 27, 2016.

Damages Spreadsheet lists "La May" as Etienne's only worksite, for which he is seeking $56.25 in damages. (Damages Spreadsheet at 20.) Plaintiffs do not claim this is an RMP site.[37] (*See id*.) Because Etienne did not travel to and from an RMP site, the Court finds that he is not entitled to recovery.

### 7.    James Foster

Foster worked at EPIC from June 2013 to August 2014. (Tr. at 214-15 (Foster).) He worked as both a field manager[38] and a security guard. (*Id*. at 216, 221, 236.) Although he worked at a few different sites in his capacity as a field manager, the only worksite for which he seeks damages for his work as a security guard is a Ray Catena dealership. (Damages Spreadsheet at 6-8; *see also* Tr. at 231-32 (Foster).) This was an RMP site. (Defs.' Exs. B, VV.)

The Court awards the sum of $1,190.00 to Foster based upon unpaid overtime for his travel to and from the Ray Catena RMP site, plus prejudgment interest in the amount of $544.00.

### 8.    Michael Howie

Howie worked at EPIC in September 2014. (Howie Aff., ECF No. 148-1, ¶ 1; Howie Decl., ECF No. 154-8, ¶ 1.) Howie was assigned to one worksite during his time working for EPIC, a restaurant construction site.[39] (Tr. at 451 (Howie).) This was an RMP site. (Defs.' Ex. J.)

---

[37] On cross-examination, Etienne gave conflicting testimony about whether an EPIC vehicle was required at the site. Although he testified that "they gave me a car," which he picked up from EPIC's headquarters and used to patrol sandy parts of the beach to ensure there were no afterhours trespassers (Tr. at 531-32 (Etienne)), he also testified that no one told him he could not take his own vehicle to the site, and that he spent much of his shift not driving. (*Id*. at 531, 546.)

[38] His duties as a field manager involved "inspecting sites," rather than performing duties as a security guard. (Tr. at 216, 221 (Foster).)

[39] The Damages Spreadsheet identifies this worksite as the Ancor worksite. The Ancor worksite was a Joe's Crab Shack. (Defs. Ex. J.)

Howie seeks damages in the amount of $47.25 under the FLSA for work during the week ending September 14, 2014. (Damages Spreadsheet at 12.) The Court awards the sum of $48.00 to Howie based upon unpaid overtime for his travel to and from the Ancor RMP site, plus prejudgment interest at the federal rate in the amount of $5.00.

9.    **Michael Hurst**

Hurst worked at EPIC from October 2014 to mid-December 2016. (Hurst Aff., ECF No. 144-8, ¶ 1; Hurst Decl., ECF No. 154-9, ¶ 1.) Hurst asserted that he worked at the following sites, among others: Northstar Contracting (Hurst Aff. ¶ 5; Hurst Decl. ¶ 5); Jewish Child Care Association ("JCCA")[40] (Hurst Aff. ¶ 6; Hurst Decl. ¶ 5); Avalon Bay Watchung[41] (Hurst Aff. ¶ 7; Hurst Decl. ¶ 5); Yankee Clipper (Hurst Aff. ¶ 9; Hurst Decl. ¶ 5); and the Spartan Race worksite (Hurst. Decl. ¶ 5). Further, the Damages Spreadsheet indicates that he worked at Ardsley Country Club and Red White and Blue.[42] (Damages Spreadsheet at 13-15.)

Northstar, Ardsley Country Club, Spartan Race and Yankee Clipper were RMP sites. (*See* Defs.' Exs. L, NN, BBB & EEE.) JCCA was not an RMP site (*see* Defs.' Ex. A),[43] nor was Red White and Blue. (*See* Defs.' Ex. E.) The only Avalon Bay contract in evidence relates to the site in Hackensack, New Jersey. (Catina Decl. ¶ 6(iv).)

---

[40] Hurst testified on cross-examination that he sometimes took a bus to this site. (Tr. at 476, 479.)

[41] Hurst testified that he worked at several Avalon Bay sites. (Tr. at 474.)

[42] He testified that he may have worked at other sites, which he did not remember, in addition to those mentioned. (Tr. at 468 (Hurst); *see also* Hurst Decl. ¶ 5.)

[43] In the Damages Spreadsheet (at 13), Plaintiffs point to a call-in sheet for JCCA on January 10, 2015, which relates to Israel Rivera, and states "TEMP. UNIFORM SEC. SERVICE WITH R.M.P." (Defs. Ex. JJJ at 2508.) This entry is not evidence that Hurst was required to drive an RMP to the JCCA site.

Plaintiffs contend that the two Avalon Bay sites at which Hurst worked were RMP sites based upon certain call-in sheets. For Avalon Bay Watchung, Plaintiffs refer in the Damages Spreadsheet (at 13) to a call-in sheet for June 13, 2015 relating to Hurst with the notation, "TEMP. UNIFORM SEC. SERVICE WITH R.M.P." (Defs.' Ex. JJJ at 9661.) The Court finds that this document is evidence that Hurst was required to drive an RMP to the Avalon Bay Watchung site on June 13, 2015.[44] However, the Court also finds that Plaintiffs have not met their burden of proof to show that Hurst was required to drive to this site on other days.

For Avalon Bay Bloomfield, Plaintiffs refer in the Damages Spreadsheet (at 13) to a call-in sheet for November 21, 2015 relating to Hurst with the notation, "TEMP. UNIFORM SEC. SERVICE WITH R.M.P." (Defs.' Ex. JJJ at 17474.) The Court finds that this document is evidence that Hurst was required to drive an RMP to the Avalon Bay Bloomfield site on November 21, 2015.[45] However, the Court also finds that Plaintiffs have not met their burden of proof to show that Hurst was required to drive to this site on other days.

Hurst seeks damages only under the FLSA. (Damages Spreadsheet at 15.) The Court awards him the sum of $5,400.00 based upon unpaid minimum wages and overtime for his travel to and from RMP sites, plus prejudgment interest at the federal rate in the amount of $350.00.

**10.**  **Taquesha Lawyer**

Lawyer worked at EPIC for about eighteen weeks from December 2014 to April 2015. (Lawyer Aff., ECF No. 144-9, ¶ 1; Lawyer Decl., ECF 154-10, ¶ 1.) Lawyer was assigned to one

---

[44] The Court has credited Hurst for his travel time to and from the Avalon Bay Watchung site on June 13, 2015.

[45] The Court has credited Hurst for his travel time to and from the Avalon Bay Bloomfield site on November 21, 2015.

worksite, Ardsley Country Club. (Lawyer Aff. ¶ 4; Lawyer Decl. ¶ 5.) The Ardsley site was an RMP site. (*See* Defs.' Ex. L.)

Lawyer seeks damages under the FLSA only.[46] (Damages Spreadsheet at 37.) The Court awards her the sum of $2,636.00 based upon unpaid minimum wages and overtime for her travel to and from the Ardsley Country Club RMP site, plus prejudgment interest at the federal rate in the amount of $242.00.

**11.** **Princess Logan-Williams**

Logan-Williams worked at EPIC from October 18, 2013 to April 22, 2014. (Logan-Williams Aff., ECF No. 144-11, ¶ 1; Logan-Williams Decl., ECF No. 154-12, ¶ 1.) She worked at the following sites: Russo Development (Logan-Williams Aff. ¶ 7; Logan-Williams Decl. ¶¶ 5-6.); Garden State Plaza Mall (where Whiting-Turner was the EPIC client) (Logan-Williams Aff. ¶ 8; Logan-Williams Decl. ¶¶ 5-6); Alice Fiore (Logan-Williams Aff. ¶ 9; Logan-Williams Decl. ¶¶ 5-6); and Reicon Group. (Logan-Williams Aff. ¶ 10; Logan-Williams Decl. ¶¶ 5- 6.) All these worksites are contained on the Damages Spreadsheet. (Damages Spreadsheet at 22.)

Russo, Garden State Plaza and Alice Fiore are RMP sites. (*See* Defs.' Exs. H, ZZ & CCC.) Although there is no contract in evidence relating to the Reicon site (Catina Decl. ¶ 6(xii)), Defendants admit that Reicon was an RMP site. (Defs.' Spreadsheet, ECF No. 188-3.)

The Court awards the sum of $2,980.00 to Logan-Williams based upon unpaid minimum wages and overtime for her travel to and from RMP sites, plus prejudgment interest in the amount of $1,367.00.

---

[46] Defendants assert that Lawyer was terminated from her employment at EPIC because she was accused of stealing. (Defs. Post-Trial Mem. at 15.) Such accusations do not provide Defendants a basis for failing to pay her amounts owed under the FLSA.

12.    **Deneice Martin**

Martin was employed by EPIC from October 19, 2013 to November 2, 2013. (Martin Decl., ¶ 1.) She was assigned to two worksites: (1) a construction site;[47] and (2) Garden State Plaza Mall (*i.e.*, Whiting-Turner). (*See* Martin Aff., ECF No. 144-12, ¶¶ 3, 7; Martin Decl. ¶5.) Both sites were RMP sites. (Defs.' Ex. ZZ & CCC.)

The Court awards the sum of $31.00 to Martin based upon unpaid minimum wages for her travel to and from RMP sites, plus prejudgment interest in the amount of $14.00.

13.    **Michael Mitchell**

Mitchell worked at Forest Hills Gardens in Queens (Mitchell Aff., ECF No. 144-13, ¶ 4; Mitchell Decl. ¶ 5), which is the only worksite for which he seeks damages. (Damages Spreadsheet at 10.) In total, he seeks damages under the FLSA in the amount of $405.00. (*Id.*)

Forest Hill Gardens was an RMP site (Defs.' Ex. V), but EPIC kept an EPIC vehicle onsite. (Mitchell Aff. ¶ 5; Tr. at 309 (Mitchell).) Thus, Mitchell stated in his affidavit that, on some days, he would use that vehicle onsite, and on those days, he commuted directly to Forest Hill Gardens from his home via public transportation. (Mitchell Aff. ¶ 6.) However, on cross-examination, he testified that he reported to EPIC's headquarters and drove a vehicle for every shift he worked at Forest Hill Gardens. (Tr. at 314 (Mitchell)), which directly contradicted his sworn affidavit. The Court finds that Mitchell is not a credible witness since he directly contradicted his affidavit in open court.[48]

---

[47] The Damages Spreadsheet identifies this site as Russo Development. (Damages Spreadsheet at 11.)

[48] In any event, Plaintiffs candidly state in the Damages Spreadsheet that Forest Hill Gardens was "technically not an 'RMP site,'" since an RMP was "stored at site." (Damages Spreadsheet at 10.)

The Court finds that, since EPIC maintained a vehicle onsite, security guards were not required to transport an EPIC vehicle to the site. Thus, time spent driving to and from the Forest Hill Gardens site was not compensable, and Mitchell is not entitled to recovery.

**14.** **Michael Moulton**

Moulton worked for EPIC from April 2015 to March 2016. (Tr. at 549 (Moulton).) During that time, he was assigned to about six or seven sites, but only two of which required a vehicle. (*Id*. at 550, 563); *see also* Moulton Aff., ECF No. 144-14, ¶ 5.) The first was Impact Real Estate in Long Island City. (*Id.* ¶ 6.) This was an RMP site. (Defs.' Ex. CC.) The second site was a Ray Catena car dealership. (Moulton Aff. ¶ 7.) This also was an RMP site. (Defs.' Exs. B & VV.)

Moulton seeks damages under the FLSA in the amount of $240.19. (Damages Spreadsheet at 21.) The Court awards him the sum of $241.00 based upon unpaid overtime for his travel to and from RMP sites, plus prejudgment interest at the federal rate in the amount of $20.00.

**15.** **Jonathan Reece**

Reece worked for EPIC from 2009 to October 2013. (Reece Decl., ECF No. 154-15, ¶ 1.) Reece worked at a Brickens Construction site in the summer of 2010. (Reece Aff., ECF No. 144-15, ¶ 5.) This was an RMP site. (Defs.' Ex. P.) Reece also worked at the following sites that both sides agree are not RMP sites: 99 Evergreen (Defs.' Ex. U); Daytop Village (Defs.' Ex. III); and Castaways Yacht Club. (Defs.' Ex. R.) In addition, Reece worked at the Jacksonville Chapel site, which Plaintiffs assert was an RMP site. (Damages Spreadsheet at 25.)

The EPIC contract with Jacksonville Chapel does not reflect that it is an RMP site. (Defs.' Ex. FF.) However, Plaintiffs assert that it is an RMP site based upon a call-in sheet. (Damages Spreadsheet at 25.) The call-in sheet to which Plaintiffs refer is dated June 28, 2015, and contains

an entry that on that day Samuel Wright served as an "UNARMED UNIFORM SEC. OFF. W/RADIO MOTOR." (Defs.' Ex. JJJ at 10397.) This entry is not evidence that Reece was required to drive an RMP to the Jacksonville Chapel site. Moreover, Reece's testimony at trial was that he worked at the Jacksonville Chapel site directing traffic, not using an RMP. (*See* Tr. at 647.) Thus, the Court finds that Reece is not entitled to damages for his travel to and from the Jacksonville Chapel site.

The Court awards the sum of $1,890.00 to Reece based upon unpaid minimum wages and overtime for his travel to and from the Brickens Construction RMP site, plus prejudgment interest in the amount of $1,450.00.

**16.** **Warren Richardson**

Richardson worked at Deepdale Gardens, a gated housing community, from August 2014 to January 2015. (Richardson Aff., ECF No. 144-16, ¶ 5; Richardson Decl., ECF No. 154-16, ¶ 5.) Plaintiffs' Damages Spreadsheet does not list Deepdale as an RMP site. (Damages Spreadsheet at 24.)

Richardson testified at trial that the site required an RMP, but also testified that EPIC kept a vehicle there on-site. (Tr. at 614 (Richardson).) Richardson testified that such vehicle was "mainly for show." (*Id*. at 614-15.) Another plaintiff, Veliz, whose testimony the Court credits, also testified that EPIC kept a vehicle on-site at Deepdale, which Veliz used to patrol. (Tr. at 703 (Veliz).) Veliz further testified that that he drove to Deepdale in an EPIC vehicle for his own convenience. (*See id*. at 701-02.)

Because an EPIC vehicle was kept on-site at Deepdale, the Court finds that Richardson was not required to drive an EPIC vehicle to the site. Thus, he is not entitled to recovery of any damages.

17.    **Israel Rivera**

Rivera seeks damages for his travel time to and from the following sites that both sides agree are RMP sites: Ardsley Country Club (Defs.' Ex L); Leesel Bus Depot (Defs.' Ex. II); Hylan Datacom (Defs.' Exs. AA & BB); Northstar (Defs.'' Ex. NN); and Avalon Bay Hackensack (Defs.'' Ex. M).[49] In addition, Rivera worked at the Louis Gargiulo and Baker Properties sites, which are both RMP sites. (Defs.' Exs. N & KK.)

The other sites where Rivera worked, which he asserts are RMP sites, are JCCA, Red Lobster, Avalon Bay Edgewater, Avalon Bay Princeton, RAAD and P. Judge & Sons. (Damages Spreadsheet at 16-19.) As previously discussed, JCCA[50] and RAAD Construction are not RMP sites. Plaintiffs assert that Red Lobster is an RMP site by citation in the Damages Spreadsheet (at 16) to a call-in sheet that nowhere mentions Red Lobster. (*See* Defs.' Ex. JJJ at 4389.) The Court finds that Plaintiffs have not met their burden of proof to show that Red Lobster was an RMP site.

As stated earlier, the only Avalon Bay contract in evidence relates to the site in Hackensack, New Jersey. (Catina Decl. ¶ 6(iv).) Plaintiffs suggest that Avalon Bay Edgewater is an RMP site based upon a call-in sheet from January 29, 2015 which reflects that Rivera served as a "UNARMED UNIFORM SEC. OFF. W/RADIO MOTOR" at that site on that day.[51] (Defs.' Ex. JJJ at 3199.) This document does not reflect that an RMP was required at the Avalon Bay Edgewater

---

[49] *See* Damages Spreadsheet at 16-19; Defs.' Spreadsheet, ECF No. 188-3.

[50] There is a call-in sheet for JCCA on January 10, 2015 reflecting that Rivera was required to drive an RMP stating: "TEMP. UNIFORM SEC. SERVICE WITH R.M.P." (Defs. Ex. JJJ at 2508.) This call-in sheet reflects that Rivera was required to drive an RMP to JCCA on January 10, 2015, but not on other days. The Court has credited Rivera for his travel time on that day.

[51] The Court has credited Rivera for his travel time to and from the Avalon Bay Edgewater site on January 29, 2015.

site every day. Further, Plaintiffs suggest that Avalon Bay Princeton was an RMP site based upon a call-in sheet from March 8, 2015 which reflects that Rivera served as a "UNARMED UNIFORM SEC. OFF. W/RADIO MOTOR" at that site on that day.[52] (Defs.' Ex. JJJ at 4905.) This document does not reflect that an RMP was required at the Avalon Bay Princeton site every day. Thus, the Court finds that Plaintiffs have not met their burden of proof to show that the Avalon Bay sites at which Rivera worked were RMP sites.

There is no contract in evidence for the P. Judge & Sons site. (Catina Decl. ¶ 6(iii).) Plaintiffs assert that P. Judge & Sons was an RMP site based upon a call-in sheet from April 23, 2016 which reflects that Rivera served as a "UNARMED UNIFORM SEC. OFF. W/RADIO MOTOR" at that site on that day. (Defs.' Ex. JJJ at 24682.)[53] This document does not reflect that an RMP was required at the P. Judge & Sons site every day. Thus, the Court finds that Plaintiffs have not met their burden of proof to show that P. Judge & Sons was an RMP site.

The Court awards the sum of $3,600.00 to Rivera based upon unpaid minimum wages and overtime for his travel to and from RMP sites, plus prejudgment interest in the amount of $900.00.

## 18. Winston Synaker, III

Synaker seeks recovery of FLSA damages of $177.38 based upon his assertion that he was required to drive an EPIC vehicle between EPIC's headquarters and an Avalon Bay site. (Synaker Aff., ECF No. 144-18, ¶ 4; Damages Spreadsheet at 36.) Defendants do not contest that the site

---

[52] The Court had credited Rivera for his travel time to and from the Avalon Bay Princeton site on March 8, 2015.

[53] The Court has credited Rivera for his travel time to and from the P. Judge & Sons site on April 23, 2016.

where Synaker worked was an RMP site. (Defs.' Spreadsheet, ECF No. 188-3.) Thus, the Court awards the sum of $180.00 to Synaker based upon unpaid overtime for his travel to and from the site, plus $20.00 in prejudgment interest at the federal rate.

**19.**    **Saul Veliz**

Veliz seeks recovery for his travel to and from the Judge Organization and Crystal Point sites during the period December 2012 to August 2013. (Damages Spreadsheet at 29.) Defendants acknowledge that Veliz worked at both sites and that they are both RMP sites. (Defs.' Spreadsheet, ECF No. 188-3.)

The Court awards the sum of $2,550.00 to Veliz based upon unpaid overtime for his travel to and from RMP sites, plus prejudgment interest in the amount of $1,300.00.

**20.**    **Jose Vicent**

Vicent seeks damage only under the FLSA. (Damages Spreadsheet at 35.) Vicent worked at EPIC from the end of 2006 or beginning of 2007 to 2016. (Vicent Aff., ECF No. 152-1, ¶ 1.) Vicent stated he worked at several sites that required him to drive from EPIC headquarters to the worksite.[54] (Vicent Aff. ¶ 5.) Vicent seeks damages for his time spent driving between EPIC's headquarters and the following worksites: Northstar, US Pipeline, Avalon Bay Watchung, Avalon Bay Vauxhall Road, RAAD, JCCA and Ardsley Country Club.[55] (Damages Spreadsheet at 32-35.)

---

[54] Vicent testified he could not remember "every site in detail" because he worked for EPIC for "so long" and worked at many sites. (Vicent Aff. ¶ 5.) The Court finds this testimony to be credible, especially given the fact that he worked at multiple sites, unlike some plaintiffs who only worked at a few sites.

[55] Vicent does not seek compensation for time spent driving between EPIC's headquarters and 99 Evergreen, Red White & Blue and Avalon Bay Bloomfield. (Damages Spreadsheet at 34-35.) Client contracts with 99 Evergreen and Red White & Blue show that these were non-RMP sites. (Defs.' Exs. E & U.)

Client contracts with Northstar, US Pipeline and Ardsley Country Club show those sites were RMP sites. (Defs. Exs. L, NN & FFF.) As discussed above, the client contract with JCCA indicates it was not an RMP site. (Defs.' Ex. A.) Further, on cross-examination, Vicent conceded that JCCA was not an RMP-site: he testified he did not need to use the vehicle while performing his job duties; he would park it at the site and then perform his job duties in a guard booth. (Tr. at 750-51.) He testified that he would have taken his own personal vehicle to the JCCA site, if he had one. (*Id*. at 753.) In addition, as discussed above, the EPIC contract with RAAD Construction does not require an RMP (Defs.' Ex. D), and the Court finds that it was not an RMP site.

Regarding the Avalon Bay Watchung site (for which Vicent seeks damages), on cross-examination at trial he testified that he took the EPIC vehicle because the site was far away, not because EPIC required him to drive the vehicle. (*See* Tr. at 754.) Vicent claims that Avalon Bay Vauxhall Road is an RMP site based upon a call-in sheet for November 1, 2015 which reflects that Vicent served as a "TEMP. UNIFORM SEC. SERVICE WITH R.M.P." at that site on that day.[56] (Defs.' Ex. JJJ at 16448.) This document does not reflect that an RMP was required at the Avalon Bay Vauxhall Road site every day. Thus, the Court finds that Plaintiffs have not met their burden of proof to show that these Avalon Bay sites were RMP sites.

Vicent brings his claims under the FLSA only. (Damages Spreadsheet at 35.) The Court awards the sum of $5,290.00 to Vicent based upon unpaid minimum wages and overtime for his travel to and from RMP sites, plus prejudgment interest at the federal rate in the amount of $350.00.

---

[56] The Court has credited Vicent for his travel time to and from the Avalon Bay Vauxhall Road site on November 1, 2015.

21.    **Hilburn Walker**

Walker worked at EPIC from June 2015 to August 2015. (Walker Decl. ¶ 1; Tr. at 61 (Walker).) Plaintiffs seek damages for Walker's travel to and from four sites that Plaintiffs characterize as RMP sites. (Damages Spreadsheet at 2.) Defendants do not contest that these sites are RMP sites. (*See* Defs.' Spreadsheet, ECF 188-3.)

The Court awards the sum of $1,505.00 to Walker based upon unpaid minimum wages and overtime for his travel to and from RMP sites, plus prejudgment interest in the amount of $490.00.

22.    **David Williams**

Williams worked at EPIC for approximately three weeks, beginning on February 6, 2013. (Tr. at 21.) He seeks damages of a few hundred dollars. (Damages Spreadsheet at 1.) Williams' testimony confirmed that the only worksite EPIC assigned him to was Daytop Village. (Tr. at 23.) Daytop Village was a non-RMP worksite. (Def Ex. III.) His responsibilities at Daytop included patrolling the site on foot; he was not required to patrol using a vehicle. (*Id*. at 37-38, 40.) The "assignment sheet" Williams received from EPIC, which informed him of his assignment to Daytop Village, provided instructions for how to get to the worksite via public transportation (*i.e.*, by bus). (Tr. at 33; Pls.' Ex. 2.)

Williams testified that Far Rockaway, where Daytop Village was located, was adversely affected by damage from Hurricane Sandy. (Tr. at 53.) For example, only buses, not the subway, were running to that area following the hurricane. (*Id*.) Therefore, when Williams reported to Daytop, he always drove a vehicle there, whether his own or EPIC's vehicle; he did not take public

transportation. (*Id.*) To facilitate him getting to the site, EPIC offered a company vehicle for his use.[57]

Since Daytop Village was a non-RMP site, Williams is not entitled to recovery for his claims.

**23.  Samuel Wright**

Wright worked for EPIC from approximately March 2010 through December 16, 2016.[58] (Offer of Proof, ECF No. 154-1, ¶ 6.) Plaintiffs assert that the following sites were RMP sites: Judge Organization, Jacksonville Chapel, Avalon Bay Watchung, Avalon Bay Princeton, Ardsley Country Club and Whiting-Turner. (Damages Spreadsheet at 41-44.)

Defendants agree that Judge Organization site was an RMP site. (Defs.' Spreadsheet, ECF No. 188-3.) Moreover, Ardsley Country Club was an RMP site, as was Whiting Turner. (Defs.' Exs. L & ZZ.) However, as stated earlier, the Jacksonville Chapel contract did not require an RMP (*see* Defs.' Ex. FF), and the Court finds that Plaintiffs have not met their burden of proof to show that Jacksonville Chapel was an RMP site. Similarly, as stated earlier, the Court finds that Plaintiffs have not met their burden of proof to show that the Avalon Bay Watchung and Avalon Bay Princeton sites were RMP sites.

---

[57] Williams testified that he dropped off and picked up another EPIC security guard and took her to/from another worksite, which was *en route* to Daytop Village. (*See* Tr. at 26.) Even if the Court were to find that Williams driving another EPIC security guard to work somehow was compensable, *but see Hodge*, 2008 WL 2397674, at *10 ("Where the drivers were merely transporting others and had to arrive at work in any event, even though they discussed work with their subordinates, their task was no different than what a commuter would normally do on a drive to work with or without other passengers"), the Court finds that his testimony about this arrangement was inconsistent and not credible. Indeed, Williams admitted to inconsistencies between his testimony about this driving arrangement and the Vehicle Use Reports which he filled out, which did not match his testimony. (*See* Tr. at 51.)

[58] Due to a health condition, Wright was unable to testify at trial, but Defendants agreed to accept his testimony by means of the Offer of Proof that was filed on his behalf. (*See* Tr. at 246.)

The Court awards the sum of $29,000.00 to Wright based upon unpaid minimum wages and overtime for his travel to and from RMP sites, plus prejudgment interest in the amount of $10,583.00.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for leave to file the Second Amended Complaint. (ECF No. 139.) The Court awards to Plaintiffs the damages and prejudgment interest set forth below. The Court declines to award liquidated damages under either the FLSA or the NYLL. The Court finds that Defendant Falk is not an employer for purposes of the FLSA and NYLL, and thus has no liability.

Plaintiffs[59] are awarded damages and prejudgment interest against Defendant EPIC Security Corp., as set forth in the chart below:

---

[59] If a Plaintiff's name is not included in the chart below, no award is being made in favor of that Plaintiff.

| Name | Damages | Prejudgment Interest | Total |
|------|---------|----------------------|-------|
| Adrian Brown | $7,850.00 | $2,210.00 | $10,060.00 |
| Sharon Carr | $1,040.00 | $495.00 | $1,535.00 |
| Roger David | $1,285.00 | $90.00 | $1,375.00 |
| James Foster | $1,190.00 | $544.00 | $1,734.00 |
| Michael Howie | $48.00 | $5.00 | $53.00 |
| Michael Hurst | $5,400.00 | $350.00 | $5,750.00 |
| Taquesha Lawyer | $2,636.00 | $242.00 | $2,878.00 |
| Princess Logan-Williams | $2,980.00 | $1,367.00 | $4,347.00 |
| Deneice Martin | $31.00 | $14.00 | $45.00 |
| Michael Moulton | $241.00 | $20.00 | $261.00 |
| Jonathan Reece | $1,890.00 | $1,450.00 | $3,340.00 |
| Israel Rivera | $3,600.00 | $900.00 | $4,500.00 |
| Winston Synaker, III | $180.00 | $20.00 | $200.00 |
| Saul Veliz | $2,550.00 | $1,300.00 | $3,850.00 |
| Jose Vicent | $5,290.00 | $350.00 | $5,640.00 |
| Hilburn Walker | $1,505.00 | $490.00 | $1,995.00 |
| Samuel Wright | $29,000.00 | $10,583.00 | $39,583.00 |

Under Federal Rule of Civil Procedure 54, Plaintiffs have fourteen days from the entry of this Opinion and Order to submit an application for attorneys' fees and costs.

**SO ORDERED.**

DATED:      New York, New York
                February 22, 2019

_____
STEWART D. AARON
United States Magistrate Judge